ALBERT J. ISGUR & others[1] *vs.* SCHOOL COMMITTEE
OF NEWTON
(and a companion case).

Suffolk.  January 11, 1980. — February 28, 1980.

Present: BROWN, GREANEY, & DREBEN, JJ.

*Education,* Special educational needs. *School and School Committee,*
Special educational needs. *Administrative Law,* Regulation.

Although a school's failure to comply with a regulation of the Department
of Education requiring a full core evaluation of a learning disabled
child to be performed on the parents' request went to the essence of
rights protected by St. 1972, c. 766, the parents were not entitled to
reimbursement for tuition costs for their son's private schooling where
the parents failed to show that the school's program for their son, as es-
tablished after an intermediate core evaluation and modified by a

[1] Evelyn Isgur and John Isgur (the latter by Albert and Evelyn, his
parents and next friends).

decision of the Bureau of Special Education Appeals, could not benefit him to the "maximum extent feasible" while retaining him in the least restrictive alternative to a regular education program. [295-301]

CIVIL ACTIONS commenced in the Superior Court on March 2, 1976, and July 6, 1976, respectively.

The cases were consolidated for trial and were heard by *Sullivan, J.*

*Terrance J. Hamilton* for the plaintiffs.

*Susan L. Kurland,* Assistant City Solicitor, for the School Committee of Newton.

*Anne L. Josephson,* Assistant Attorney General, for the Commissioner of the Department of Education & another.

GREANEY, J. The plaintiffs seek reimbursement for tuition costs for their son John's private schooling commencing in September, 1975, which they claim was necessitated by the failure of the School Committee of Newton (Newton) to provide an adequate special education plan for him under the provisions of St. 1972, c. 766,[2] and applicable regulations of the Department of Education (department) as then in effect. See generally c. 766 regulations as appearing in 8 Code Mass. Regs., Part 3, at 258-376 (1974). In this context, they present for our consideration the following question, which was answered in the negative by the judge below: does a failure to comply with the regulation requiring a full core evaluation[3] to

---

[2] Section 11 of that chapter inserted G. L. c. 71B, which by reason of St. 1973, c. 318, § 3, became effective on September 1, 1974. All references to c. 71B in this opinion are to the statute, as appearing in St. 1972, c. 766, § 11.

[3] As will be discussed more fully in the body of this opinion, the parties agree that John received an intermediate core evaluation, which requires the participation of fewer experts in assessing a child and working out an adequate educational plan for that child, than does the more extensive full core evaluation, which his father requested for him. The applicable regulation then provided in relevant part that "[a] full core evaluation shall be required if the child's parents request it. Such parents shall be made fully aware of this right, which must be waived, in writing, before an intermediate core evaluation can be administered." Reg. 319.1(b). The core evaluation process involves the determination by skilled personnel in different disciplines of the strengths and special needs of a particular

be performed on the parents' request go to the essence of rights granted by c. 766? Although we answer this question in the affirmative, we agree with the Superior Court judge that, on this record, no substantial right of the plaintiff was prejudiced by John's receiving an intermediate core evaluation instead of the full core evaluation requested by his parents. As a result we affirm the judgment entered in the Superior Court.

John Isgur was recognized by Newton to be a learning disabled child with visual perception problems in mathematics and reading when he was in first grade, prior to the effective date of c. 766. During the second and third grades, he received tutoring in reading from the public school's learning disability instructor and special help in mathematics. In December, 1974, when John was in the third grade, his father referred him for a full core evaluation[4] pursuant to c. 766, which had become effective that prior September. Instead, on February 4, 1975, the school gave John an intermediate core evaluation[5] with a core evaluation team (team) which consisted of three of John's teachers (learning disability instructor, mathematics teacher and classroom teacher), the school psychologist, the principal, and John's parents. The plan recommended by that team included education in a regular classroom, with forty minutes of reading four times each week with a reading

child, followed by the recommendation of an individual educational plan for that child based upon these evaluations.

[4] The following persons perform assessments for a full core evaluation: a teacher, an administrator, a psychologist, a physician, and a nurse or social worker. Reg. 320.0. These persons are then joined by the child's parents, the experts who will be primarily responsible for the child's special education, and any professional outside the school system then working with the child. Together they form the core evaluation team which formulates a specific educational plan for the child based on the information gathered by the assessments. Reg. 311.0.

[5] An intermediate core evaluation provides a lesser number of assessments than a full core, as agreed upon by the team and the parents. These persons write the educational plan along with the parents, the special education persons who will implement the plan, and any professional then working with the child outside of school. Reg. 331.0.

teacher and assistance in mathematics laboratory three times each week.[6] The Isgurs rejected this plan on March 21, 1975, and requested an independent evaluation of John by a neurologist (Reg. 328.0), which was conducted in June, 1975.[7] In that same month the parents also filed an appeal to the Bureau of Special Education Appeals (bureau), which held hearings in November and December of 1975. Meanwhile, in September, 1975, the parents entered John in private school, where he was placed in a classroom of ten students with two teachers for science and social studies and where he was also given one hour of mathematics instruction and one hour of language class in small groups.[8]

The hearing officer for the bureau found that the education plan as written by the team was inadequate because "it was overly vague and general and did not detail John's capabilities, goals to be set for him, means to achieve goals, or criteria for determining whether or not goals were met," but that a subsequent in-depth explanation to the parents before their rejection of the plan had cured all of these defects.[9] The hearing officer concluded that the Newton school system offered a program adequate to meet the needs of John Isgur "in most areas," and she accepted the plan as written with certain modifications, including more extensive individualized help in mathematics and the develop-

---

[6] As a result of an intermediate core evaluation, the team may only recommend either a regular education program with modifications or a regular education program with no more than 25 % of the time in special education programs to be spent outside the classroom. Reg. 331.1(b).

[7] In addition to their absolute right initially to request a full core evaluation (Reg. 319.1[b]), the parents had a right to request a full core evaluation upon completion of the intermediate one. *Ibid.* The record does not reveal whether the parents were aware of this right and chose not to exercise it, or thought it was inapplicable in their situation.

[8] At the time of the hearing before the bureau, the private school had not yet written a special education plan for John because of a policy not to do so until a child had been in attendance at the school for three months.

[9] The hearing officer also required the team to rewrite the plan as modified "to comply with section 321 of the regulations," undoubtedly intending to refer the team to the necessary general elements of an educational plan under Reg. 322.0.

ment of new strategies to aid John in dealing with his school-related anxiety. The parents then appealed to the State Advisory Commission for Special Education (commission), which, after oral argument and review of the administrative record,[10] ordered the placement recommended by the bureau.[11] The parents sought review in the Superior Court,[12] which entered a judgment affirming the decision of the commission.

The parents argue that because a court must set aside an agency decision based upon an error of law (G. L. c. 30A, § 14[7]), the failure of the committee to perform a full core evaluation for John requires the invalidation of the decisions of the bureau and the commission. The plaintiffs further assert that the bureau's decision, which was the basis of the commission and Superior Court decisions, should be overturned because it is unwarranted on the facts found, arbitrary and capricious, and an abuse of discretion.[13] *Id.* We evaluate

---

[10] The tentative decision of the commission noted that it had before it the case record, tapes of the hearing, the educational plan, the decision of the hearing officer of the bureau "and several other documents pertaining to the hearing held on John Isgur," presumably the exhibits before the hearing officer, which included the report of the neurologist who had examined John.

[11] Under Reg. 407.0, and G. L. c. 30A, § 11(7) and (8), the commission first issued a tentative decision with a form to the parents enabling them to object to the decision and submit a written argument. No such argument was filed, and the commission adopted its tentative decision as its final one.

[12] The parents originally sought review of the bureau decision in the Superior Court; this action was stayed to permit exhaustion of the administrative remedy of an appeal to the commission. After the commission decision, the plaintiffs filed a second action in Superior Court, for review on the whole record, which was consolidated for hearing with the first.

[13] The defendants ask us to reject the plaintiffs' arguments that the hearing officer's decision is unwarranted on the facts found, arbitrary or capricious, or an abuse of discretion because they were not raised below. However, the defendants asserted the negative of this claim as part of their answer in Superior Court "insofar as the complaint alleges a violation of General Laws, Chapter 30A." The judge correctly ruled that the standards of review found in G. L. c. 30A, § 14, govern special education appeals under G. L. c. 71B, and he treated the plaintiffs' complaint accordingly. See *Amherst-Pelham Regional Sch. Comm* v. *Department of Educ.*, 376 Mass. 480, 497-498 (1978). It appears to us that these

these claims together by first examining the statutory scheme to determine the exact nature of the rights protected by c. 766; we then examine those rights within the factual context presented to the bureau to ascertain whether John and his parents were substantially deprived of any of those rights.

1. *The statutory and regulatory scheme.* Chapter 766 was intended to establish a flexible and uniform system of special education for all children in need thereof, to destigmatize such children, to remedy past inadequacies and inequities in the provision of needed services, to encourage State agencies to recognize and consider the variety of characteristics and needs of these children, and to assure that special education programs actually benefit the children placed therein. St. 1972, c. 766, § 1. In addition, the Legislature specifically recognized that the "inadequacies and inequities in the provision of special education services to children with special needs have resulted largely from a lack of significant parent and lay involvement in overseeing, evaluating and operating special education programs . . . ." *Ibid.* To counteract this difficulty, it designed c. 766 to provide "an accountable procedure for evaluating each child's special needs thoroughly before placement in a program and periodically thereafter." *Ibid.* In order to assure its stated objectives, the Legislature also provided a comprehensive statutory scheme which: (a) enabled the school, the parents, and other specified nonschool personnel to refer a child for evaluation of special needs; (b) spelled out the types of assessments required for this evaluation; [14] (c) dele-

___

arguments were raised and considered below, and we consequently will consider them here. Moreover, the record we are concerned with is the record established by the State administrative agencies, and it is that record which forms the basis for our review under G. L. c. 30A, § 14.

[14] In pertinent part, G. L. c. 71B, § 3, requires the following unless otherwise specified by departmental regulation: "Within thirty days after said notification the school committee shall provide an evaluation as hereinafter defined. Said evaluation shall include an assessment of the child's current educational status by a representative of the local school department, an assessment by a classroom teacher who has dealt with the child in the classroom, a complete medical assessment by a physician, an assessment by a psychologist, an assessment by a nurse, social worker, or a guidance or ad-

gated to the Department of Education (jointly with the Departments of Mental Health and Public Health) the authority to determine by regulation circumstances in which the statutory assessments could be waived; and (d) established the parents' rights to reject the program provided by a school committee pursuant to these assessments, to receive administrative hearings from the department and the commission, and to appeal from such determinations to the Superior Court. G. L. c. 71B, § 3. In light of this explicit and comprehensive statutory attention to detail (*Amherst-Pelham Regional Sch. Comm.* v. *Department of Educ.*, 376 Mass. 480, 489 [1978]), the unambiguous language of the governing provisions, and its stated reasons for enacting a comprehensive special education act, the Legislature obviously intended to make mandatory upon school committees compliance with all validly enacted departmental regulations governing the substance and number of assessments required for a given educational evaluation. See generally 1A Sands, Sutherland Statutory Construction §§ 4.15, 4.18, 25.03, 25.04 (4th ed. 1972).

Under the applicable c. 766 regulations, a full core evaluation (see note 4, *supra*) provides all the required statutory assessments (see note 14, *supra*), while an intermediate core evaluation provides for an unspecified "lesser number of assessments . . . after agreement between the parents and the [team] chairperson." Reg. 331.1(a). Moreover, "[a] full core evaluation shall be required if the child's parents request it," (Reg. 319.1[b]), and the parents must be made fully aware of this right and must waive it in writing before an intermediate core evaluation can be administered. Even where a waiver has been filed, the parents retain the right to request a full core evaluation upon completion of the intermediate one if the parents believe that the intermediate evaluation was insufficient. *Ibid.* The reason for guaranteeing the parents' absolute right

justment counselor of the general home situation and pertinent family history factors; and assessments by such specialists as may be required in accordance with the diagnosis including when necessary, but not limited to an assessment by a neurologist, an audiologist, an ophthalmologist, a specialist competent in speech, language and perceptual factors and a psychiatrist."

to a full core evaluation becomes apparent through examination of the differences between full and intermediate core evaluations which are provided by the regulations. In both cases, the experts who conduct the assessments must participate as parts of the team in formulating an educational plan for the special needs of the child. Regs. 311.0 and 331.1(a). Therefore, in addition to receiving fewer assessments, the child who is given an intermediate core evaluation rather than a full one has the participation of fewer specialists at the crucial planning and writing stages, where one expert can be expected to respond to the observations of another and to offer unique and discerning professional insights in developing concrete approaches to particular problems. Because the neurologist's report was available for the hearing before the bureau, the judge concluded that, in effect, John had received all the assessments (except that of a nurse) to which he was entitled. However, apparently overlooked below was the significance of the core evaluation itself, in which the team makes specific recommendations for a child, based upon each member's consideration of all the information in the various assessments.

As a result of an intermediate core evaluation, a child like John may only be assigned to a regular education program with modifications or a regular education program with no more than 25% time out of regular classrooms. Reg. 331.1(b). While it is true that the parents or the team may nonetheless petition for a full core evaluation upon completion of the intermediate one if they deem it desirable (Reg. 331.1[c]), it somewhat begs the question for the committee to cite and rely upon this regulation as a shield to defend their admitted failure to give the requested full core evaluation in the first instance.[15] Therefore, it seems likely that the team for

[15] No claim is made that the committee did so in bad faith. Rather, it appears from the record that the committee was still feeling its way with a relatively complex new statute. We also note that, although c. 766 was enacted in 1972 and went into effect September 1, 1974, presumably to give schools time to become familiar with its requirements, the first regulations pursuant to c. 766, which implemented the statute and provided concrete guidance to the school committees as to its operation, were not issued until May 28, 1974.

an intermediate core evaluation begins the evaluation with a strong inclination towards finding a regular education program for that particular child. There is nothing objectionable about seeking the least restrictive placement for a child, and, even after a full core evaluation, the regulations favor "mainstreaming" the child — keeping him in a regular classroom program to the extent possible. See Reg. 322.6(b). Both c. 766 and the regulations which flesh out the act treat the assessment and planning for the individual needs of each child as crucial. *Board of Educ.* v. *Assessor of Worcester*, 368 Mass. 511, 514 (1975). It follows that a failure to comply with the regulation requiring a full core evaluation upon the parent's request goes to the essence of rights protected by c. 766. This conclusion does not end our inquiry, however, because the plaintiffs are entitled to relief under G. L. c. 30A, § 14(7), only if their substantial rights have been prejudiced by the decision of the bureau as incorporated into and affirmed by the decision of the commission. *Duato* v. *Commissioner of Pub. Welfare*, 359 Mass. 635, 640 (1971), and cases cited.

2. *The question of prejudice.* The hearing officer for the bureau considered the testimony of six witnesses and examined some twenty-nine exhibits; several exhibits were referred to in her findings of fact. She reported that all the evaluators described John as a child of above average ability with specific learning disabilities in reading and mathematics stemming from a visual perceptual problem, which the director of pupil personnel services described as "mild." Newton had been providing John with learning disability tutoring and extra help in mathematics since first grade, and his father stated at the hearing that "the results of the time put in with John were very good." At the time of the hearing before the bureau, John was reading roughly two years below his grade level and was approximately a year behind in mathematics. His fourth grade private school teacher, who had taught him for two months at the time of the hearing, felt that he needed a highly individualized program where class size would be limited. She also expressed

the concern that his emotional problems interfered with his progress. However, the Newton psychologist felt he was relatively well-adjusted and capable of learning to cope with all of his educational problems. His third grade teacher felt that by the end of the school year 1974-1975, John had learned to read well enough to make sense out of the written material from the total curriculum, and that he was encouraged and motivated by an enjoyment of this ability.

These findings amply support the conclusions of the hearing officer that "John's special needs, described by most as mild, are not so severe or unusual that a private day placement is warranted," and that the necessary education for John "is available within the public system [as] the least restrictive appropriate placement for [this] child." Moreover, we note, as did the judge below, that the hearing officer had available to her the report of the neurologist who had examined John. We do not have that report before us, and it appears from the record that the judge reviewing the case did not have it either. We assume that there is nothing in this report which contradicts the general impression created by the record, namely, that John was presented to the team and the hearing officer as a child with many strengths, and that he was learning to deal successfully with a recognized disability in a regular public school classroom because of the sensitive and flexible additional help afforded him by the Newton public school staff. At the point that his parents decided to remove him from the Newton school system and to place him in a private school setting, he had shown a positive response to the special educational program which Newton had provided for him, and the school was clearly willing to continue to make necessary adjustments for his benefit. Of course, it is possible that he might have made greater progress in the presumably smaller classes at the private school, just as we assume that many non-special needs children would make greater progress in smaller classes if there were resources to provide them, but this is not the test for determining prejudice to John and his parents.

General Laws c. 71B specifically provides for reassignment from one program to another "[i]n the event that said

program is not benefiting the child and that another program may benefit the child more." G. L. c. 71B, § 2. It is obvious to us from the record that John was benefited by the Newton program and would not have been entitled to a reassignment pursuant to this section. The statute also provides for a reevaluation of both the child and the special education program "[w]ithin ten months after placement of any child in a special education program and at least annually thereafter." G. L. c. 71B, § 3. If during this evaluation, it is felt that the original evaluation was in error or that another program would benefit the child more, "appropriate reassignment or alteration in treatment shall be recommended to the parents . . . [and if] the evaluation of the special education program shows that said program does not benefit the child to the maximum extent feasible, then such child shall be reassigned." *Ibid.* However, the language "maximum extent feasible" as used in the statute must be interpreted in light of the clear preference under the statutory and regulatory scheme for keeping the child wherever possible in a regular education program· or the least restrictive alternative placement. In support of this goal, G. L. c. 71B, § 3, provides that "when the suggested course of study is other than regular education [the team] shall present . . . conditions that would indicate that the child should return to regular classes, and a comparison of expected outcomes in regular class placement." Similarly, the regulations require, for each educational prototype chosen, a determination by the team that the less restrictive alternatives are not appropriate (Reg. 324.2), and· an annual review indicating "[w]hether the child has met the criteria which indicate readiness to enter a less restrictive program . . . ." Reg. 333.1(b).

Applying these principles to the facts found by the hearing officer, we conclude that the plaintiffs did not sustain their burden of establishing that the Newton program as modified could not benefit John to the "maximum extent feasible" while retaining him in the least restrictive alternative to a regular education program. Perhaps the parents

could have made such a showing by presenting to the hearing officer the neurologist's evaluation of the other assessments performed upon John, by requesting a further hearing date after the private school had written an educational plan for him, or by demonstrating through testimony of the other witnesses that John required a class size and structure which was not possible in a public school setting. Absent this type of clear and unequivocal evidence to contradict her ultimate conclusion, we find not only no abuse of discretion or arbitrary conduct on the part of the hearing officer but also that no substantial right of the plaintiffs has been prejudiced. In light of the complexity and novelty of the statutory and regulatory schemes when Newton performed John's intermediate evaluation, the committee's good faith efforts to provide John the education to which he is entitled, and the demonstrably compelling conclusion from the record that the team for a full core evaluation would have proposed a plan much like that accepted by the hearing officer, we find no reversible error. The parents are not entitled to the reimbursement for private school tuition here sought (contrast *Amherst-Pelham Regional Sch. Comm.* v. *Department of Educ., supra* at 493), and the judgment is affirmed.

*So ordered.*