## DAVID D.

v.

## DARTMOUTH SCHOOL COMMITTEE, et al.

### Civ. A. No. 83–1753–Z.

United States District Court, D. Massachusetts.

Sept. 11, 1984.

---

Richard F. Howard, Developmental Disabilities Law Center, Boston, Mass., for plaintiff.

Kim E. Murdock, Ass't Atty. Gen., Government Bureau, Boston, Mass., for defendants.

## MEMORANDUM OF DECISION

ZOBEL, District Judge.

David D. is a 17-year old adolescent with Downs Syndrome who lives with his parents in Dartmouth, Massachusetts and has received special education services from the Dartmouth Public Schools. He commenced this seven-count action pursuant to the Education for All Handicapped Children Act of 1975, 20 U.S.C. §§ 1401–20 (EAHCA) following a decision by the defendant Massachusetts Department of Education's Bureau of Special Education Appeals ("BSEA") that the Individual Education Program ("IEP") offered by defendant Dartmouth School Committee ("Dartmouth") for the 1982–83 school year was appropriate for his special education needs, rejecting plaintiff's contention that those needs required a residential setting.[1] Plaintiff seeks judicial review of the BSEA decision and appropriate declaratory and

---

**1.** The first count of his complaint alleges substantive error in the BSEA finding and a consequent violation ·of the EAHCA. Counts II and III allege violations of the procedural requirements of the EAHCA in that the hearing officer was not impartial; and that plaintiff's parents were not given adequate notice of or assured full participation in the development of the challenged IEP. Count IV alleges that these actions constituted discrimination in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and Count V that such discrimination also violated plaintiff's right to equal protection under the Fourteenth Amendment to the United States Constitution. Count VII raises the pendent claim of violation of the relevant state statute, Mass.Gen.Laws ch. 71B, and ch. 15, § 1M. Plaintiff voluntarily dismissed Count VI, based on the Massachusetts Constitution.

injunctive relief, with costs and attorneys' fees.

20 U.S.C. § 1415(e)(2) directs that in reviewing an administrative decision under the EAHCA "the court shall receive the records of the administrative proceeding, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."

## I. *The Administrative Findings*

The evidence presented at the BSEA hearing included the testimony of David's mother concerning his sexual and aggressive behavior directed at animals and persons in the community, which had led her to believe the nonresidential Dartmouth program to be inadequate to meet his needs. In addition, Mr. Bowman and Dr. Rogoff, a psychologist and psychiatrist who examined David at the Developmental Evaluation Clinic of Children's Hospital Medical Center opined that elimination of this behavior would require a 24-hour a day training program, and Mr. Asztalos, Program Director at the Learning Center for the Multiply Handicapped, described the resident program the Center offered David. On the other hand, David's teacher in the Dartmouth special education program testified to his satisfactory progress and lack of significant behavior problems during the school day, an account corroborated by David's physical education teacher.

The hearing officer, in a careful and thorough opinion, found that plaintiff had shown the ability to control his sexual and aggressive drives within the school setting, and was achieving effective educational progress toward the goals contained in the 1982–83 IEP. She concluded that his breaches of acceptable social behavior outside the structured school situation were isolated, and that he had demonstrated the capacity to generalize his ADL ("activities of daily living") skills at home and in the community. She noted that plaintiff's educational program should be directed towards maximizing his potential for eventual placement in a community-based program or private employment. Because she felt that plaintiff's sexual preoccupation could be a deterrent to his acceptance in such placements, she found that therapy to assist plaintiff in dealing with his sexual feelings was a necessary supportive service. She accepted Dartmouth's proposed amendment to the IEP providing for individual therapy for plaintiff and family counseling for his parents and sister with a licensed clinical social worker, and found that the IEP as amended was adequate and appropriate to meet plaintiff's special educational needs in the least restrictive prototype mandated by the governing statutes. Plaintiff filed this action on July 1, 1983.

## II. *Evidence Presented at Trial*

In addition to the administrative hearing record, the parties offered several witnesses to supplement that record. In accordance with the First Circuit's directive that such evidence must not change the character of the hearing from one of review to a trial *de novo, Town of Burlington v. Department of Education,* 736 F.2d 773, 790–91 (1st Cir.1984) (*"Burlington II"*) the additional evidence concerned only the time subsequent to the hearing or was offered by witnesses who did not appear at the hearing and was noncumulative.

Dr. Andrea Spencer is Director of Programs at the Doctor Franklin Perkins School ("FPS") in Lancaster, Massachusetts, which serves moderately and severely retarded children, most with behavioral problems. She initially observed plaintiff at Samoset House, a weekend respite placement, in May 1984, and further observed him when he visited FPS on May 23, 1984. His behavior during evaluations of his academic, pre-vocational and speech skills was adequate, but deteriorated during a tour of the school. He refused to follow directions, ran uncontrollably up and down a fire escape and into offices, and leapt repeatedly over a safe in the residential area. He also exhibited sexually provocative behavior, kissing a secretary and touching another staff member's buttocks. Dr.

Spencer testified that his behavior was extreme even when compared with that of students with similar cognitive functioning. She stated that his refusal to follow directions and his sexual behavior, if continued, would significantly restrict his future options, since placement in a community residence or workshop requires some internal control.

In her opinion, the overall goal of any special education program is to assist the student to maximize his ability for independence as an adult. She stated that because plaintiff's behavior problems impede his progress toward that goal, even if they occur only outside the classroom, they constitute needs which a special education program must address. Such an educational program should address plaintiff's social and behavioral needs in a consistent way throughout his waking hours. She described the behavior modification technique FPS would use to eliminate plaintiff's unacceptable behavior, by systematically rewarding finite periods of good conduct. In order to be successful, such a program must be carried on every day and throughout the day by trained staff. At FPS plaintiff would receive training in functional academics, speech, art, and music therapy, and adaptive physical education, as well as prevocational training designed to enable him to meet the standards of a sheltered workshop, during the six-hour school day; and engage in activities structured by staff from the close of the school day until his bedtime.

Dr. Spencer opined that the Dartmouth IEP was not sufficient to overcome plaintiff's behavioral problems because it did not provide for a consistently administered program training plaintiff to generalize the social skills he learned in the classroom to situations encountered in all his waking hours. She believed that after a one to two year stay at FPS such an IEP might be adequate for plaintiff's needs, but that at this time those needs require residential placement at an institution such as FPS.

Richard Asztalos, a behavioral specialist at the Learning Center for the Multiply Handicapped ("LC") in Belmont, agreed with Dr. Spencer's assessment of plaintiff's need for a residential placement. At the BSEA hearing he had offered the LC as an appropriate residential program for plaintiff. He testified at the trial that the LC would now not be able to accept plaintiff, since LC's community setting made it impossible adequately to control plaintiff's behavior without devoting an unacceptably high amount of the LC's resources to him. In assessing plaintiff's behavior he relied on his observations of plaintiff during a three-hour evaluative visit to the LC on January 4, 1984. Although plaintiff responded fairly well during his academic evaluation, during later pre-vocational tasks and meetings with other students he refused to respond to directions, hugged several students and grabbed their genitals. While being driven to the residence area of the LC he jumped between the front and back seats of the car and similarly hugged and touched both Mr. Asztalos and the driver. His behavior caused Mr. Asztalos to cancel the rest of the evaluation.

Mr. Asztalos testified that plaintiff's behavior would bar him from acceptance in community programs. He further opined that the Dartmouth IEP was inadequate to enable plaintiff to generalize behavior learned in the classroom to unstructured settings, and that such generalization was a necessary element of any special education program for plaintiff.

Dr. John Paul, a staff psychiatrist at the Children's Hospital Developmental Evaluation Clinic ("DEC") and member of an evaluation team met plaintiff on December 2, 1983 and observed him during his day at the clinic. He testified that during his session with him plaintiff exhibited a continuous preoccupation with sexual themes. On the way to Dr. Paul's office, plaintiff hugged a girl on crutches; only Dr. Paul's prompt action kept her from falling. Plaintiff also made advances toward persons in the waiting room and touched females in an inappropriate manner.

The DEC team concluded that plaintiff needed further diagnostic evaluation and residence in a 24-hour highly structured facility because of his inability to conform to norms of social behavior even for those at his cognitive level. In Dr. Paul's opinion, the Dartmouth IEP would not be sufficient to address plaintiff's need for consistent continuous training, given the frequency and intensity of his unacceptable actions. Even accepting the hearing officer's finding that such incidents were isolated events, Dr. Paul believed that the nature and intensity of plaintiff's actions made residential placement necessary in order for him successfully to learn to control them.

Benjamin Handen, a clinical psychologist, evaluated plaintiff during his eight-week stay at Bradley Hospital beginning in January 1984. He twice met with plaintiff in forty-five minute evaluation sessions, and consulted with staff working with plaintiff during all of his time at Bradley. During the evaluation sessions plaintiff again engaged in sexual play with dolls and directed sexual behavior at Mr. Handen. He was able to stop this behavior when given organized tasks to perform. In the evening hours, during less structured time, his deviant behavior was more frequent, with an average of six incidents per evening.

In Mr. Handen's opinion a 24-hour residential program is necessary to give plaintiff consistent and intensive training in appropriate behavior and an increased opportunity to be with his peers and learn to relate in an acceptable way to them. Even conduct such as touching and staring needed to be eliminated because such conduct together with more clearly unacceptable behavior was likely to prevent plaintiff's eventual placement in a community setting where he could be as independent as possible. Mr. Handen noted that given plaintiff's age (17 years) and the type and intensity of his deviant conduct he is now also in danger of conflicts with the law. Mr. Handen believed that one to two years of a residential program would enable plaintiff to return to the community and function successfully. He opined that the Dartmouth IEP was not sufficient to train plaintiff in the continuous and consistent way necessary, since it left him too much unsupervised time.

Two neighbors of plaintiff also gave testimony concerning his behavior. Both recounted several incidents of plaintiff's socially inappropriate activities and his aberrant behavior with girls (one very young) and with dogs.

Gina Barbero, a 1983 graduate of Dartmouth High School, testified concerning her observations of plaintiff during time she spent as an aide in his classroom during the 1982–83 school year. In that capacity she spent three forty-minute periods per week with plaintiff and his classmates during the later part of the school day, when activities were relatively unstructured. The regular class teacher, Mrs. Thomson, was almost always present in the room during that time, along with at least one other high school aide. Ms. Barbero on a few occasions saw plaintiff lie on the floor and try to look up girls' skirts. He also would move his chair very close to a female student's or aide's and touch her knee or arm or hug her. Ms. Barbero did not remember whether or not Mrs. Thomson was in the classroom when plaintiff engaged in this particular behavior. She stated that when Mrs. Thomson observed plaintiff engaged in any unacceptable touching she disciplined him by having him sit removed from the group; Ms. Barbero saw plaintiff so disciplined about once a week. She stated that plaintiff behaved badly when a substitute teacher was in charge of the classroom. She believed plaintiff's unacceptable touching of females in the school outside his classroom was encouraged by other students.

Defendant offered the testimony of Mrs. Thomson, plaintiff's special needs teacher at Dartmouth during the 1983–84 school year, to supplement her testimony at the BSEA hearing relating to his performance in prior years. Plaintiff attended her class from September 1983 to January 1984 and returned to it from mid-May 1984 through

the end of the school year. Mrs. Thomson testified that his behavior was generally appropriate during the school day. He responded well to verbal reinforcement and to his peer tutors. She believed that he had gained in self control, requiring less frequent verbal reminders as to expected behavior. He was able to go to and from the gymnasium alone, and was mainstreamed for two gym classes each week and lunch in the cafeteria each day. She noted that plaintiff had re-adapted to the school program without difficulty when he returned in May after a four-month absence. A few weeks before the trial plaintiff had gone to a local restaurant for lunch with his class. He sat in a booth with a classmate and two high school aides and his behavior was completely appropriate throughout the meal. Mrs. Thomson stated that the class goes on such outings to the community twice a week. She noted that plaintiff's IEP addresses social skills, sex education and behavior needs, which are part of plaintiff's special education needs. She felt that increasing the ability to generalize training is an important element of a program for plaintiff, and that at present he needs either instruction in appropriate behavior before encountering any new situation, such as attendance at a high school football game, or external structure (supervision) in that setting. She believed that the Dartmouth IEP provided for the kind of training and structure plaintiff needed. Because plaintiff responds readily to verbal reinforcement (he always ceased touching others when reminded) she felt that a complex behavior management program for him was not necessary. She believed that plaintiff needed to work on resolving his problems in sexuality, but noted that sex education was part of the IEP, and that the counseling offered by Mr. Messmer was adequate.

## III. *The Standard the IEP Must Meet*

The EAHCA provides a federal minimum standard or "basic floor" of beneficial education, which the First Circuit has defined as "demonstrable improvement in the educational and personal skills identified as special needs—as a consequence of implementing the proposed IEP." *Burlington II* at 788. Where the district court determines that state law mandates a higher standard of educational service than the federal minimum, "the state standard will operate to determine what an appropriate education requires for a particular child in a given state." *Id.* at 789.[2]

The Massachusetts statutes relating to special education programs provide in relevant part:

"The department [of Education] shall promulgate, in cooperation with the departments of mental health, public health and social services, regulations regarding programs for children with special needs including but not limited to a definition of special needs; provided, however, that such definition shall emphasize a thorough narrative description of each child's developmental potential so as to minimize the possibility of stigmatization and to assure the maximum possible development of a child with special needs, and, provided further, that such definition shall be sufficiently flexible to include children with multiple special needs. . . .

No child shall be assigned to a special education class unless it is first determined by an evaluation of the child's needs and the particular special education program that the child is likely to benefit from such program; periodically thereafter, and in no event less often than annually the child and his program shall be reevaluated to determine whether said child is benefiting from said pro-

---

**2.** The state argues that Eleventh Amendment considerations embodied in the holding of *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) bar a federal court from ordering a state agency to comply with state standards. However, the First Circuit, writing after the *Pennhurst* deci-

sion, expressly held that the state standard was incorporated by reference in the federal EAHCA, *Burlington II* at 789 thus the case here presents a question of compliance with federal law. The state's further Eleventh Amendment argument is unpersuasive.

gram in accordance with the procedures set forth in section three. In the event that said program is not benefiting the child and that another program may benefit the child more, or said program has benefited the child sufficiently to permit reassignment, the child shall be reassigned, and in the event of consistent failure of a program to benefit children there assigned, the program shall be abolished or altered." Mass.Gen.Laws ch. 71B, § 2.

"Within ten months after placement of any child in a special education program, and at least annually thereafter the child's educational progress shall be evaluated as set forth above. If such evaluation suggests that the initial evaluation was in error or that a different program or medical treatment would now benefit the child more, appropriate reassignment or alteration in treatment shall be recommended to the parents, guardians or persons having custody of the child. If the evaluation of the special education program shows that said program does not benefit the child to the maximum extent feasible, then such child shall be reassigned." Mass.Gen.Laws ch. 71B, § 3

The parties agree that the statutory language should be interpreted in light of the whole statute's clear preference for keeping the child wherever possible in a regular education program or the least restrictive alternative placement, *Commonwealth v. School Committee of Springfield*, 382 Mass. 665, 669, 417 N.E.2d 408, 410 (1981); *Isgur v. School Committee of Newton*, 9 Mass.App. 290, 299, 400 N.E.2d 1292, 1298 (1980); and that private school placement is mandated only where the public schools cannot meet the child's special needs and the private school program is the least restrictive way to meet those needs. *Commonwealth v. School Committee of Springfield*, 382 Mass. 665, 669, 417 N.E.2d 408, 410 (1981); *School Committee of Franklin v. Commissioner of Education*, 17 Mass.App. 683, 697, 462 N.E.2d

338, 347 (1984). State law is thus congruent with the federal right to an education in the least restrictive environment.

The parties disagree, however, as to the overall standard by which to judge whether a program is meeting the child's educational needs satisfactorily. Defendants, relying upon language in the cases cited above,[3] argue that if a child is "benefiting" from his current program he cannot be transferred to a more restrictive program even though it might benefit him more. They point to the First Circuit's footnote statement in *Burlington II* that: "[a] state standard ... which provides a substantive level of benefits exceeding the federal floor of opportunity may not be applied such that the federal right to an education in the least restrictive environment will be diminished." *Id.* at 789 n. 19. Plaintiff counters with the next sentence in that footnote: "... [T]he least restrictive environment guarantee ... cannot be applied to cure an otherwise inappropriate placement...." He notes that the court in the *Isgur* case cited by defendants recognized "maximum extent feasible" as the standard to be applied, *Isgur* 9 Mass.App. at 299, 400 N.E.2d 1292, and that the case was cited for that proposition in *Burlington II,* at 789. Moreover, the Supreme Judicial Court in a recent decision interpreted the first paragraph of Mass.Gen.Laws ch. 71B, § 2 (reproduced above) as requiring the Department of Education to administer special education programs " 'to assure the maximum possible development of a child with special needs.' " *Stock v. Massachusetts Hospital School,* 392 Mass. 205, 211, 467 N.E.2d 448 (1984).

◼ The weight of authority thus supports plaintiff's position that the Massachusetts standard requires more from an educational program than the "demonstrable improvement in the educational and personal skills identified as special needs" mandated by the federal Act, and therefore the

---

**3.** None deals directly with the issue of what constitutes the substantive standard under state law.

state standard must be used in determining what an appropriate education requires for plaintiff. *Burlington II* at 789. The issue to be determined therefore is whether Dartmouth's IEP addresses plaintiff's special educational needs so as to assure his maximum possible development in the least restrictive environment consistent with that goal.

## IV. *The 1982–83 IEP*

The parties agree that social skills including sex education are part of this plaintiff's special education needs and progress in social skills and personal development is among the objectives set forth in the 1982–83 IEP for plaintiff. To meet these objectives Mrs. Thomson taught one weekly class in sex education during 1982–83 and another in social skills. She also inculcated social skills "as an ongoing thing;" the class participated in weekly trips into the community to promote generalization of learned social skills to settings outside the classroom.

After the BSEA hearing, Dartmouth amended the IEP to include individual therapy for plaintiff and family counseling for his parents and sister with Ernest Messmer, a licensed clinical social worker and primary therapist at the Retarded Program of the Center for Human Services, Inc. After an initial evaluation of plaintiff, Mr. Messmer proposed that his treatment consist of a "behavioral specialist" providing 5–10 hours of training a week to plaintiff in order to try to decrease his unacceptable behavior, and a weekly "consultation and training" session for his parents.

## V. *Findings of Fact and Conclusions of Law*

■ The hearing officer found that the IEP as amended met plaintiff's needs. The First Circuit has made it clear that judicial review of the decision below should not amount to a trial *de novo*. *Colin K. by John K. v. Schmidt*, 715 F.2d 1, 5 (1st Cir.1983). Rather, the district court is to make "bounded, independent decisions— bounded by the administrative record and

additional evidence, and independent by virtue of being based on a preponderance of the evidence before the court." *Burlington II* at 791. The question of the weight due the administrative findings of fact is left to the discretion of the trial court. *Id.* at 792. "The court, in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue. After such consideration, the court is free to accept or reject the findings in part or in whole." *Id.*

Based on a preponderance of all the evidence before me, I make the following findings. I accept the hearing officer's finding that plaintiff functions intellectually at the lower end of the moderately retarded range (with functional academic development at the kindergarten to first grade level) and that he exhibits socially unacceptable sexual and aggressive behavior. The hearing officer found that this included cruelty and sexual aggression directed at animals and inappropriate touching of females. Evidence at trial concerning plaintiff's behavior since the hearing supports these conclusions and establishes that such behavior has continued without interruption.

I also accept the hearing officer's finding that plaintiff has demonstrated the ability to exercise internal controls over his sexual and aggressive drives within the school environment. The testimony at trial of Mr. Handen and Dr. Paul reinforced Mrs. Thomson's testimony that he was able to comply with acceptable behavioral standards in a structured setting.

The hearing officer further found that plaintiff was achieving effective educational progress, that his breaches of acceptable social standards outside the school situation were isolated, and that he had thus demonstrated a capacity to generalize his training in daily living. After careful consideration of the evidence upon which her finding was based and of the evidence presented at trial concerning plaintiff's be-

havior in unstructured situations, I reject these conclusions.

The preponderance of all evidence compels a finding that plaintiff cannot adhere to acceptable standards of behavior when not under supervision or in a carefully controlled setting.[4] I am mindful that much of the more extreme sexual and other disruptive behavior occurred in evaluative settings unfamiliar to plaintiff; two of these were residential schools, and at FPS he understood he might be placed there. However, I credit Dr. Spencer's testimony that plaintiff's behavior was not attributable to the evaluative setting; that in her experience prospective students were generally more hesitant and well behaved than usual when coming to the school for evaluation. Moreover, plaintiff behaved inappropriately not only in *every* evaluative setting where plaintiff was seen, but in his own neighborhood around home and school. Plaintiff on numerous occasions attempted to engage in sexual play with dogs. He has repeatedly entered a neighbor's house without permission and refused to leave, and refused to leave automobiles. During his eight-week evaluative stay at Bradley Hospital, plaintiff engaged in inappropriate touching and other improprieties several times each day when left alone. Even Mrs. Thomson described an incident when plaintiff disrupted a high school football game which he attended without supervision; she did not believe he could behave acceptably at such events unless supervised. The additional evidence received at trial made it

clear that plaintiff's unacceptable actions do not occur merely as isolated instances but rather are a continuing and consistent problem.

All witnesses agreed and I find that the ability to generalize social and behavioral skills learned in the classroom is an appropriate part of a special educational program for mentally retarded persons such as plaintiff.[5] David's need for training to enable him to generalize behavioral control learned in school is therefore one that should be addressed by his IEP.

I accept the conclusion of plaintiff's experts that the Dartmouth IEP as amended was not adequate to meet plaintiff's need to learn to generalize social skills because it did not provide for consistent response to his behavior and training in control of them throughout his waking hours. A residential program is necessary in order to teach plaintiff to behave appropriately in situations lacking external controls. I find that without such a program plaintiff's behavior is likely to continue and agree with the hearing officer's finding that such behavior would prevent him from being accepted in a community-based residence or workshop for which he is otherwise well suited.

The state standard mandates that an IEP assure plaintiff's maximum possible development.[6] I find persuasive the unanimous opinion of plaintiff's experts that plaintiff requires a residential training program in order to achieve the maximum progress in development in his ability to function as

---

**4.** The hearing officer listed the following four findings in support of her conclusion that plaintiff could generalize appropriate behavior most of the time at home and in the community: (1) plaintiff always calls his mother to report that he has arrived at a neighbor's house; (2) he completes chores at his father's butcher shop acceptably; (3) he behaves appropriately when he goes with his father to a restaurant for breakfast on Saturdays; and (4) the DMH respite worker who provided weekend trips for plaintiff about seven times during 1982–83 has not reported any aberrant behavior. These findings show that plaintiff can act appropriately in situations with a parent or surrogate present, but I do not see in them indications of any ability to behave acceptably when not so supervised.

**5.** I further accept the hearing officer's finding that plaintiff's IEP "should be directed towards maximizing his potential for eventual placement in a community-based program or private employment." It concurs with plaintiffs' experts' opinion that the goal of any special education program is to assist the student to maximize the ability to be independent as an adult. In light of this unanimity, defendants' contention that plaintiff's social behavior problems are unrelated to his educational needs must be dismissed.

**6.** In light of *Burlington II*, the cases cited by defendants for the proposition that the federal minimum standard requires less are inapposite.

independently as possible and that a residential setting is the least restrictive environment in which plaintiff's educational needs could currently be met. Therefore, I conclude that plaintiff has met the burden of proving that the Dartmouth IEP for 1982–83 (as amended) is inadequate; and I find that placement in a residential school providing a program such as that offered by FPS is the educational placement appropriate for plaintiff.[7]

No later than September 28, 1984 counsel shall file an agreed form of judgment in accordance herewith, or, if they cannot agree, each shall file a proposed judgment.[8]

---

7. Defendants have not met their burden of persuading the court of circumstances rendering the determination as to 1982–83 inappropriate for subsequent years. *Burlington II* at 795. The 1983–84 IEP developed by defendants was never the subject of any administrative hearing and is not before me.

8. In view of this disposition, I do not address plaintiff's procedural claims, raised in Counts II, III and VII of the complaint. Counts IV and V must be dismissed in light of *Smith v. Robinson*, —— U.S. ——, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984), which also makes clear that attorney's fees are not available to plaintiff in this action.