DAVID D., etc., Plaintiff, Appellee,

v.

DARTMOUTH SCHOOL COMMITTEE, Defendant, Appellee.

Massachusetts Department of Education, Defendant, Appellant.

DAVID D., etc., Plaintiff, Appellee,

v.

DARTMOUTH SCHOOL COMMITTEE, Defendant, Appellant.

DAVID D., etc., Plaintiff, Appellant,

v.

DARTMOUTH SCHOOL COMMITTEE, et al., Defendants, Appellees.

Nos. 84–1937 to 84–1939.

United States Court of Appeals, First Circuit.

Oct. 15, 1985.

Rehearing and Rehearing En Banc Denied Dec. 3, 1985.

Richard F. Howard, Development Disabilities Law Center, Boston, Mass., for David D.

Kim E. Murdock, Asst. Atty. Gen., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., Boston, Mass., was on brief for the Massachusetts Dept. of Educ.

James M. Cronin, New Bedford, Mass., with whom Perry, Hicks, McCawley & Cronin, New Bedford, Mass., was on brief for Dartmouth School Committee.

Robert K. Crabtree and Kotin, Crabtree & Strong, Boston, Mass., on brief for the Federation for Children with Special Needs, Inc., amicus curiae.

Before BOWNES, RUBIN * and TORRUELLA, Circuit Judges.

BOWNES, Circuit Judge.

In this case arising under the Education for All Handicapped Children Act, 20 U.S.C. §§ 1401–1420 (EHA or Act), all parties present questions regarding the district court's interpretation and application of our decision in *Town of Burlington v.*

* Of the Fifth Circuit, sitting by designation.

*Department of Education of Massachusetts*, 736 F.2d 773 (1st Cir.1984) (hereafter *Burlington II* ), *aff'd sub nom. Burlington School Committee v. Department of Education*, —— U.S. ——, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). In its decision, the district court followed our direction in *Burlington II* and considered whether the state special education act mandated a higher level of benefits for disabled children than did the federal "floor" required by the federal Act. Finding that it did, the court used that standard to assess the Town's proposed Individualized Education Program (IEP) for David D., an adolescent with Down's Syndrome. The district court, 615 F.Supp. 639, then ruled that the substantially separate program the Town had proposed was deficient under the state standard, and that the child should be educated at a residential private school where there would be consistent behavior training in addition to schooling in academic skills.

The defendants-appellants, Department of Education of the Commonwealth of Massachusetts (State) and the Dartmouth School Committee (Town), claim that the eleventh amendment to the United States Constitution, as interpreted by *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (*Pennhurst II* ), prohibits the "federal courts from interpreting, applying, and enforcing the substantive requirements of state special education law against a State" in an action brought under the EHA. The State has now changed its position from that maintained in *Burlington II*, where it argued that the district court (the same district judge, we note, as in the case at bar) failed to give the weight to the state regulations and the state administrative decision that the federal Act requires. Consonant with this approach, we determined in *Burlington II* that the federal Act "incorporates by reference," 736 F.2d at 789, relevant state law and enforces that law as part of the federal right to a "free appropriate public education." 20 U.S.C. §§ 1401(18), 1412(1). Second, appellants claim that even if we reaffirm *Burlington II* with regard to the incorporation of state law, the district court's choice and application of "maximum possible development" as the applicable state substantive standard was reversible error.

Plaintiff David D. cross-appeals on two issues. He first alleges that the district court erred in declining to reach the question whether some of the Town's procedures in handling his individualized educational program and the administrative appeals process were out of compliance with the federal and state regulations. Second, plaintiff contends that the district court should have ordered the Town to provide an appropriate interim program when the educational program requested by plaintiff and initially ordered by the court was unavailable.

We begin with a brief overview of the statute at issue followed by a review of the facts as determined by the district court. We next review the controlling precedent in this circuit before turning to consider the issues presented by this appeal.

## I. STATUTORY OVERVIEW

We have reviewed the structure and operation of the statutory scheme at issue here numerous times previously. *See, e.g., Burlington II*, 736 F.2d 773; *Doe v. Brookline School Committee*, 722 F.2d 910 (1st Cir.1983); *Colin K. v. Schmidt*, 715 F.2d 1 (1st Cir.1983); *Abrahamson v. Hershman*, 701 F.2d 223 (1st Cir.1983); *Ezratty v. Commonwealth of Puerto Rico*, 648 F.2d 770 (1st Cir.1981); *see generally Board of Education of Hendrick Hudson v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). The Education for All Handicapped Children Act is designed to assist states and local agencies in their efforts to educate physically and mentally disabled children. Federal funds are provided to contracting states which promise to provide at minimum a "free appropriate public education" for all handicapped children within the state, 20 U.S.C. § 1412(1), and which agree to set up a complaint and appeal process for the children and their parents as the federal Act mandates.

The key operative feature of the federal Act is the "individualized education program" (IEP). 20 U.S.C. §§ 1401(19); 1414(a)(5). The IEP process is the means through which the statutory mandate is "tailored to the unique needs of the handicapped child." *Rowley*, 458 U.S. at 181, 102 S.Ct. at 3038. The IEP itself is formulated at a meeting of the parents, teachers, administrators and, where appropriate, the child. It must specify the instructional goals and objectives, any special services to be provided, and criteria for progress evaluation. *See* § 1401(19). The Act further requires at least an annual review of each child's IEP and authorizes revisions where appropriate. § 1414(a)(5); *see also* § 1413(a)(11).

If the parents or the child believe that the IEP the school system decides to implement provides a lesser education than they regard to be their legal right, or if they feel their procedural rights have been infringed, they have a right to an impartial due process hearing conducted by the state educational agency. § 1415(b)(2). Should any party be "aggrieved by the findings and decision" of the state administrative hearing, § 1415(e)(2) of the Act grants a right to bring a civil action in federal or state court.

## II. FACTUAL BACKGROUND

Our standard of review is that unless clearly erroneous, the facts as found by the district court are controlling. Here, with one exception, the facts are generally not disputed. The only factual matter truly at issue is whether David's special needs are severe enough to warrant a full-time, residential program or whether, instead, David is being educated to the degree legally imposed as a minimum standard by attendance at a special education day program with some supplementary services in the local school district.

David is a seventeen year old adolescent with Down's Syndrome, who learns and has skills at the kindergarten level. Although he has been gaining academic skills during the time he has been a student at the Dartmouth school, he has in recent years exhibited a range of seriously inappropriate behavior showing little or no self-control in unstructured or unfamiliar situations. David's parents are concerned that some of the behavior he has been exhibiting will result in his being unable to become a productive adult with a job in a sheltered workshop and denial of his access to and living within the mainstream community. Such has been predicted by special education professionals as the likely outcome, given the range, gravity and frequency of his inappropriate behavior. The parents maintain that the Dartmouth School Committee (Town) has not taught and will not be able to teach David self-control, rendering the IEP the Town proposed for him fatally deficient. The district court agreed with the parents and reversed the decision of the state educational agency. The court expressed the additional concern that David will come into conflict with the law if he persists in a lack of self-control.

The evidence presented at both the administrative hearing and at trial showed that David has repeatedly and unrelentingly engaged in sexual and aggressive behavior directed at persons and animals. He has repeatedly grabbed at students' genitals, lain on the floor of his classroom attempting to look up female students' dresses, tried to touch female staff and students' breasts, and tried to embrace complete strangers. He has repeatedly attempted to engage in sexual play with neighborhood dogs. He has entered neighbors' homes uninvited and has refused to leave. In every evaluative setting, David was observed engaging in seriously inappropriate behavior of a sexual and aggressive nature.

The district court carefully reviewed the testimony of special educational professionals who had had experience with David. Except for his classroom teacher, each recounted and characterized David's behavior as extreme even when compared with that of students with similar cognitive functioning. For example, when David was evaluated at the Doctor Franklin Perkins School,

his behavior substantially deteriorated over the day. He refused to follow directions, ran uncontrollably up and down a fire escape and into offices, and leaped repeatedly over a safe in the residential area. He exhibited sexually provocative behavior, such as kissing a secretary and touching another staff member's buttocks. Similar behavior occurred at each of the other evaluative settings. In one instance, the balance of the evaluation was cancelled because his behavior was too extreme for admission to that program for the severely to moderately retarded. Because of similar behavior, David had previously been sent home from a camp for the developmentally disabled.

All parties to the case agreed that social and personal skills including sex education are part of David's special education needs and that his educational program should effectively address these objectives. The conclusion of all four of the independent evaluators was the same: that David needed a comprehensive, 24-hour, highly structured special education program that would address his social and behaviorial needs in a consistent way by a trained staff throughout his waking hours. These experts, whom the district court credited, uniformly believed that given the frequency and intensity of his unacceptable actions, the Dartmouth IEP would not be sufficient to address David's need for continuous training. They were of the opinion that learning the self-control essential to living in the mainstream community would take from one to two years, and after that, David could and should be returned to the community.

## III. THE ELEVENTH AMENDMENT QUESTION

In *Burlington II* we were faced with the question whether the district court was enabled under the EHA to interpret and enforce state law as a part of ensuring a "free appropriate public education" for the disabled child. The State had contended that it was error for the district court to ascertain and effectuate only the federal statutory and regulatory mandates when, under both the federal and state Acts, the state law and implementing regulations also bound local educational agencies (LEAs) in regard to the education of special needs children. *Burlington II* at 787–88 (citing 20 U.S.C. §§ 1412(6); 1414(a)(5)–(7); 34 C.F.R. §§ 300.180–300.240; 300.452; 300.530–.534; Mass.Admin.Code tit. 603, §§ 200.0–211.0; 300.0–328.4); *see also Burlington II* at 784–85.

After carefully reviewing the statutory scheme as a whole with the goal of "interpret[ing] its various provisions harmoniously in order to achieve the congressional aims underlying the Act," *Doe v. Brookline School Committee*, 722 F.2d at 915; *see also Philbrook v. Glodgett*, 421 U.S. 707, 95 S.Ct. 1893, 44 L.Ed.2d 525 (1975), we noted that *Rowley* held that Congress had intended the federal Act to create a "basic floor" of educational opportunity for disabled children, *Burlington II*, 736 F.2d at 788 (citing *Board of Education of Hendrick Hudson v. Rowley*, 458 U.S. at 201, 102 S.Ct. at 3048 (1982)). We found "no indication in either the statutory language or the legislative history of the Act that Congress intended to create a substantive or procedural ceiling regarding the rights of the disabled child." 736 F.2d at 784. Our review of the Act convinced us that Congress had incorporated by reference relevant state substantive and procedural law with the understanding that that law would form and be enforced as part of the federal right to a free appropriate public education. *Id.* at 789.

The State now claims that we went too far, that federal courts cannot enforce pertinent state substantive law against the State as a matter of federal law owing to the restrictions of the eleventh amendment, and urges that we should limit the *Burlington II* construction to cases where the State specifically requests a federal court to enforce its law. We construe this position as being that only if a state waives its eleventh amendment immunity can a federal court enforce the state substantive law.

Despite the State's inconsistent and perhaps even contradictory positions in *Burlington II* and this case, we have reviewed our prior holding. We remain convinced that *Burlington II* correctly held the federal Act to incorporate by reference some of a state's substantive law. We feel constrained, however, to explain our prior holding in more detail although we will not repeat points adequately covered in *Burlington II;* that opinion should be consulted for the balance of our analysis. We conclude that the holding withstands the State's eleventh amendment challenge even under the more rigorous rules of *Atascadero State Hospital v. Scanlon,* —— U.S. ——, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985), where the Court required that "Congress must express its intention to abrogate the Eleventh Amendment in unmistakeable language in the statute itself." *Id.* at ——, 105 S.Ct. at 3148.

### A

█ We first review the question whether the federal Act incorporates state law. In any issue of statutory construction, the first step is an analysis of the statutory language. *North Haven Board of Education v. Bell,* 456 U.S. 512, 520, 102 S.Ct. 1912, 1917, 72 L.Ed.2d 299 (1982); *Consumer Products Safety Commission v. GTE Sylvania,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). The core right guaranteed by the federal Act, a "free appropriate public education" is defined at the beginning of the Act:

> The term "free appropriate public education" *means special education and related services which* (A) have been provided at public expense, under public supervision and direction, and without charge, *(B) meet the standards of the*

*State educational agency,* (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under section 1415(a)(5) of this title.

20 U.S.C. § 1401(18) (emphasis added). Congress explained what it meant by an "appropriate"[1] education for a handicapped child beyond the federal "floor" of benefits, *Rowley,* 458 U.S. at 201, 102 S.Ct. at 3048, *Burlington II* at 788, by two specific requirements imposed on all contracting states. The states promised to educate disabled children in accordance with "the standards of the State educational agency," 20 U.S.C. § 1401(18)(B); *see also* § 1412(6), and to review and revise periodically a disabled child's educational program, § 1401(18)(D). The Court's discussion in *Rowley* underscores the importance of each of these requirements:

> Almost as a checklist of adequacy under the Act, the definition also requires that such instruction and services be provided at public expense and under public supervision, *meet the State's educational standards,* approximate the grade levels used in the State's regular education, and comport with the child's IEP. Thus, if personalized instruction is being provided with sufficient supportive services to permit the child to benefit from the instruction, *and the other items on the definitional checklist are satisfied,* the child is receiving a "free appropriate public education" as defined by the Act.

*Rowley,* 458 U.S. at 188–89, 102 S.Ct. at 3042 (emphasis added). It would seem beyond cavil that the federal standard explicitly incorporates some of a state's substantive law[2] into the federal Act. *Accord*

---

1. Each of the four subsections of the provision amplifies what Congress intended by the adjectival modifiers. Subsection (A) explains in part what Congress meant by a "free" and "public" education; (B) sets forth a requirement for what is "appropriate"; (C) bears on determining what is both "appropriate" and "public"; and (D) which requires by reference periodic review and revision of the educational program, expli-

cates another aspect of what Congress signified by an "appropriate" education. *See Rowley,* 458 U.S. at 188–89, 102 S.Ct. at 3041–42.

2. The State contends that "standards of the State educational agency" does not import the requirements of state law. We think, however, that Congress understood that the state educational agencies' standards are not *sui generis*

*Students of California School for the Blind v. Honig*, 736 F.2d 538 (9th Cir.1984), vacated as moot, —— U.S. ——, 105 S.Ct. 1820, 85 L.Ed.2d 114 (1985).[3]

■ The federal Act mandates that each contracting state enact "policies and procedures" consistent with the federal Act to guarantee that a "free appropriate public education" is provided to each handicapped child in the state. §§ 1412(2); 1413(a)(1)–(11). Some of the substantive regulations that Massachusetts has promulgated to this end include a requirement that facilities in which handicapped youths are taught must be "equal in physical aspects," Mass.Admin.Code tit. 603, § 508; that no sign may be posted stating that the classroom is for handicapped or special education, *id.* at § 508.2(b); that barriers to physical access must be removed, *id.* at § 508.3(b); and that transportation to school must be provided to the child, *id.* at § 905. Should an LEA fail to comply with these regulations, the parents and the disabled child have the right to file a complaint. § 1415(b)(1)(E). The complaints authorized by the federal Act may be brought "with respect to *any matter* related to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." *Id.; see also* § 1415(b)(2). Because the statutory definition of a free appropriate public education, as already noted, explicitly provides that a covered child's education will "meet the standards of the State educational agency," a complaint may be brought and pursued up the reviewing ladder to a state or federal court per § 1415(e)(2) on the issue of substantive conformity of a child's educational plan with the State's educational standards.

■ This construction of the statutory mandate accords with the legislative history of the Act. In explaining the conference bill to the Senate, the principal author of the Act stated:

Seventh. The provisions of existing law are clarified and strengthened with respect to impartial due process hearings and language is adopted to assure that:

Any parent or guardian may present a complaint concerning any matter regarding the identification, evaluation, or educational placement of the child or the provision of a free appropriate public education to such child. In this regard, Mr. President, *I would like to stress that the language referring to "free appropriate public education" has been adopted to make clear that a complaint may involve matters such as* questions respecting a child's individualized education program, questions of whether special education and related services are being provided without charge to the parents or guardians, *questions relating to whether the services provided a child meet the standards of the State educational agency, or any other question within the scope of the definition of "free appropriate public education."* In addition, it should be clear that a parent or guardian *may present a complaint alleging that a State* or local educational agency has refused to provide services to which a child may be entitled or alleging that the *State* or local educational agency has erroneously classified a child....

121 Cong.Rec. 37415 (Nov. 19, 1975) (Sen. Williams) (emphasis added). Senator Williams emphasized that whether the substantive standards of the state agency have been met by "the services provided a child" is a question for the due process hearing procedures. Thus, our holding that the federal right to a free appropriate public education incorporates substantive rights authorized by state special education law which become part of the federal core right

or lawless, but must conform to the mandate of state statutes as interpreted by state courts.

**3.** The State does not challenge *Burlington II*'s holding that the part of a state's special education law regarding procedural rights of the disabled child is enforceable by the federal courts. This ruling was based on the Act's explicit authorization for states to adopt greater protections for the disabled child than the federal Act requires. §§ 1415(a); 1415(b)(1); *see also Burlington II* at 785.

is bottomed on both the statutory language and authoritative legislative history.[4]

Our conclusion is reinforced by the practical and legal implications of the State's theory about the way the due process hearing system was intended to operate. Its view is that state substantive standards can be interpreted and enforced by state officials only, *i.e.*, state hearing officers and judges, but not the federal courts; that state substantive law was not intended to be incorporated into the federal Act. Such a construction would mean that from the very beginning of the administrative complaint process, the governing body of law and the applicable legal standards would be in doubt. If the case were appealed to the state hearing officer and to the state courts, state law, both substantive and procedural, in conjunction with the federal Act would form the applicable body of law. If, however, the case were appealed to a federal court, the "skeletal federal provisions designed as minimum standards," *Burlington II* at 785, would be the only source of substantive law. Under the integrated review system the federal Act sets up, the state administrative structure is responsible for the due process hearings until there is an appeal to court.[5] This means that, under the State's approach, the case could have different or more exacting stan-

dards applied to it throughout the federally-mandated but state-run administrative review process than from the court, should an appeal be heard by a federal court.

■ We do not think Congress envisioned having handicapped childrens' plans subject to double legal standards dependent solely upon the aggrieved party's choice of forum. Neither do we discern any intention that the federal Act preempt and reduce all state standards to the federal minimum. *Burlington II* at 784–85. This would conflict with the cooperative federalism courts have found to be the structural principle undergirding the Act. *See id.* at 783–84 (collecting cases). Rather, we think Congress contemplated, and due process requires, that a consistent body of law would be applied throughout all stages of the due process hearing system. Congress intertwined federal and state standards into one body of law, and did not leave EHA cases dependent upon whether an appeal is taken to a state or federal court.[6]

■ The next question is whether a state's overall substantive standard for determining the sufficiency of a handicapped child's IEP is to be treated differently from other substantive requirements mandated

**4.** The State argues that the Act's requirement that a free appropriate public education must "meet the standards of the State educational agency" is solely to assure a single line of administrative authority for special education within a state. While Congress structured the Act to achieve this administrative goal, the State's argument fails to explain why Congress considered the requirement, were it to signify nothing more, so crucial that it became one of the four explicit criteria for determining whether a free appropriate education was being provided to a child. Further, the State's construction cannot explain, and would flatly contradict, the crystal-clear explanation of the bill's chief author quoted above. The legislative history the State cites as demonstrative of congressional support for its interpretation of the provision as a mere administrative requirement goes not to § 1401(18) but to the responsibilities of the State educational agency if it wishes to maintain eligibility for federal funds under the Act. *See* § 1412(6); Sen.R. No. 94–168, *reprinted in* 1975 U.S.Code Cong. & Ad.News 1425, 1448; *compare id.* at 1448 *with id.* at 1434.

**5.** Under 20 U.S.C. § 1415(e)(2), a party aggrieved by the state administrative decision may bring a civil action in either state or federal court.

**6.** Federal incorporation or adoption of state law is not unusual. *See Burlington II* at 785 n. 9; *see also Herb's Welding Inc. v. Gray,* —— U.S. ——, ——, 105 S.Ct. 1421, 1425, 84 L.Ed.2d 406 (1985) (citing *Rodrigue v. Aetna Casualty and Surety Co.,* 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969)); *United States v. Yazell,* 382 U.S. 341, 356–57, 86 S.Ct. 500, 509, 15 L.Ed.2d 404 (1966); *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 457, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957); *DeSylvia v. Ballentine,* 351 U.S. 570, 580, 76 S.Ct. 974, 979, 100 L.Ed. 1415 (1956) ("The scope of a federal right is, of course, a federal question, but that does not mean that its content is not to be determined by state, rather than federal law").

by the state. The Congress explicitly defined a free appropriate public education as an education which "meets the standards of the State educational agency" and expressly authorized review of the question whether the education actually provided (or proposed) met those standards. Where a state has chosen to provide by law greater benefits to handicapped children than the federal Act requires, we believe Congress explicitly mandated that the courts—both federal and state—determine whether those state standards have been met. We need not decide at this time the extent of what constitutes "relevant" state substantive law; we hold only that a state's overall standard for evaluating the IEPs of handicapped children is incorporated by the federal Act.

■ The State argues that even if state law is incorporated into the federal Act, the decision of the state hearing officer on questions of state law should be considered the authoritative ruling on those questions where an appeal is taken to federal court, and should not be subject to displacement by a federal tribunal. This argument falters on several important countervailing considerations. First, the federal Act authorizes judicial review of EHA cases by state and federal courts on coequal terms. Second, the subject matter that can be appealed includes *"any* matter" relating to a disabled child's education or related rights. Finally, and most importantly, the state's construction would insulate from judicial review any rulings on state law should the aggrieved party file suit in federal court. Such a construction would therefore elevate the administrative hearing officers' decisions to those of the highest state court. Under our federal system, the federal courts should give due deference to authoritative decisions on state law rendered by a state's highest court, *O'Brien v. Skinner,* 414 U.S. 524, 531, 94 S.Ct. 740, 743, 38 L.Ed.2d 702 (1974), but the hearing officer is not enabled to render such a decision. The practical and legal effect of the State's construction would result in a federal court granting more than the deference to state agencies' construction of state

law recognized as due. *Burlington II* at 792; *see also Rowley,* 458 U.S. at 206, 102 S.Ct. at 3050. We have found no statutory basis for such an interpretation of the Act. Thus we reaffirm our *Burlington II* holding that the federal Act incorporates relevant state substantive law and enforces that law as part of the federal right to a free appropriate public education. 736 F.2d at 789.

**B**

Having settled the question of what sources provide the law Congress intended to be applicable to complaints filed by handicapped children, we now turn to the question of the eleventh amendment's strictures on congressional action. The issue is whether Congress has effectively overridden the states' sovereign immunity the Supreme Court has held the Amendment to embody. Two separate, but related questions must be addressed: first, have the requirements the eleventh amendment imposes upon Congress when it seeks to render the States subject to suit in federal court been satisfied?; and second, given that Congress has "borrowed" state law to constitute a portion of the federal Act, are there any *Pennhurst II* obstacles to a federal court's enforcement of that law over a state's objections?

To answer the first question, we turn to the recent opinion of *Atascadero State Hospital v. Scanlon,* —— U.S. ——, 105 S.Ct. 3142, 87 L.Ed.2d 171. There, the Court determined that § 504 of the Rehabilitation Act (RHA) did not effectively abrogate the states' eleventh amendment immunity from suit in federal court where litigants seek retroactive monetary relief. *Id.* at ——, ——, 105 S.Ct. at 3144, 3150. Three arguments were made and rejected: (a) that the state had waived its immunity on the basis of state law; (b) that Congress had, by enacting the RHA, abrogated the states' constitutional immunity; and (c), that by accepting federal funds under the RHA, the state had consented to suit in federal court. We are not concerned here

with arguments (a) or (c); we need determine only whether Congress effectively overrode the states' sovereign immunity in enacting the EHA. The applicable principle is clear:

> [T]he Eleventh Amendment is "necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment," that is, by Congress' power "to enforce, by appropriate legislation, the substantive provisions of the Fourteenth Amendment." *Fitzpatrick v. Bitzer,* 427 U.S. 445, 456 [96 S.Ct. 2666, 2671, 49 L.Ed.2d 614] (1976).

*Atascadero,* at ——, 105 S.Ct. at 3145. Whether Congress did so here is the question before us.[7]

■ We think Congress effectively subjected the states to suit in federal court under the EHA. *Accord Parks v. Pavkovic,* 753 F.2d 1397, 1407 (7th Cir.1985); *Crawford v. Pittman,* 708 F.2d 1028 (5th Cir.1983). The basic requirement of *Atascadero* is that "Congress must express its intention to abrogate the Eleventh Amendment in unmistakable language in the statute itself." *Id.* at ——, 105 S.Ct. at 3148 (footnote omitted). Unlike the RHA, which was the statute at issue in *Atascadero,* Congress stated in the preamble of the EHA:

> [I]t is in the national interest that the Federal Government assist the state and local efforts to provide programs to meet the needs of handicapped children in order *to assure equal protection of the law.*

Pub.L. 94–142, § 3(b)(9) *codified at* 20 U.S.C. § 1400(b)(9) (emphasis added); *see Smith v. Robinson,* —— U.S. ——, 104 S.Ct. 3457, 3486, 82 L.Ed.2d 746 (1984). Although the RHA incorporates, and by implication, seeks to promote equal protection *values,* nowhere in the statute itself did Congress expressly declare that it was acting to assure equal protection of the law; it was for this reason that the RHA "fell far short" of the mark needed to abrogate states' sovereign immunity.

In addition to this "unmistakeable" statutory language, and again in contrast to the RHA, the Supreme Court has already extensively discussed the EHA's grounding on the Equal Protection Clause. In *Smith v. Robinson,* —— U.S. ——, 104 S.Ct. 3457, 82 L.Ed.2d 746, the Supreme Court affirmed this court's holding that the EHA was the exclusive scheme for vindicating handicapped children's rights to "a free appropriate public education as guaranteed by the Equal Protection Clause...." *Id.* at 3468. Consequently, the Court held that no 42 U.S.C. § 1983 action to vindicate those rights would lie. The Court went so far as to characterize the plaintiffs' constitutional (fourteenth amendment) claims, which were based on denial of due process and denial of equal protection as "virtually identical to their EHA claims." *Id.* Finally, the Court held in *Smith:*

> In light of the comprehensive nature of the procedures and guarantees set out in the EHA and Congress' express efforts to place on local and state educational agencies the primary responsibility for developing a plan to accommodate the needs of each handicapped child, we find it difficult to believe that Congress meant to leave undisturbed the ability of a handicapped child to go directly into court with an *equal protection claim to a free appropriate public education.*

*Id.* at 3469. As support for this determination, the Court pointed to the unambiguous statutory language of § 1400(b)(9) and noted that the impetus behind the EHA was two federal cases establishing that a state's failure to provide to handicapped

---

7. Defendants contend that the EHA is a product of Congress' Spending Clause powers. Indeed, it partially flows from such power, *see Rowley,* 458 U.S. at 190 n. 11, 204 n. 26, 102 S.Ct. at 3042 n. 11, 3049 n. 26; *Ezratty v. Commonwealth of Puerto Rico,* 648 F.2d 770, 777 (1st Cir.1981). But as the Court clarified in *Smith v. Robinson,* —— U.S. ——, 104 S.Ct. 3457, 3468, 82 L.Ed.2d 746 (1984), *see infra,* the EHA is also an exercise of fourteenth amendment powers designed to effectuate the Equal Protection Clause. *Accord Crawford v. Pittman,* 708 F.2d 1028, 1036 (5th Cir.1983). In any event, the Court did not in *Atascadero* differentiate between the standards applicable under the two clauses.

children a free public education appropriate to their needs was a constitutional violation. *See Smith v. Robinson,* 104 S.Ct. at 3468; *Rowley,* 458 U.S. at 180 n. 2, 192–200, 102 S.Ct. at 3037 n. 2, 3043–47, and H.R.Rep. No. 94–332 at 3–4, all referring to *Mills v. Board of Education of District of Columbia,* 348 F.Supp. 866 (D.C.1972), and *Pennsylvania Assn. for Retarded Children v. Commonwealth,* 334 F.Supp. 1257 (E.D.Pa.1971) and 343 F.Supp. 279 (E.D. 1972).

In addition to the explicit comments within the statute itself and the Supreme Court's ruling that Congress considered itself to be acting under its fourteenth amendment powers to promote the equal protection of the law, there is other evidence of congressional intent to subject states to federal court jurisdiction. Unlike the remedies for violation of § 504 of the RHA, which are broadly directed to *"any recipient of Federal assistance,"* and include a broad range of institutions and organizations, the EHA is directed to one class of actors: states and their political subdivisions responsible for providing public education. *See, e.g.,* 20 U.S.C. §§ 1412, 1413; 34 C.F.R. § 300.2. This accords with the most basic of political knowledge that free public education is provided by and under the aegis of the states.

Under the federal Act and its implementing regulations, the State educational agency promises to ensure that it and its local educational agencies will provide at minimum a free appropriate public education. Part of these guaranteed rights is the due process complaint and hearing system which is to take cognizance of *"any matter relating to"* a disabled child's education or procedural rights. The culmination of the state administrative appeals process is the right of any party "aggrieved" by the decision or procedure employed to take the matter to either state or federal court. § 1415(e)(2). Obviously, since the state is responsible for guaranteeing that a child will receive both the substantive and procedural rights set forth in the Act, Congress intended that the State should be named as an opposing party, if not the sole party, to

the proceeding. The legislative history reinforces this view. *See supra* at 13 (primary author of bill stated: "In addition, it should be clear that a parent or guardian *may present a complaint alleging that a State* or local educational agency has refused to provide services to which a child may be entitled or alleging that the *State* or local educational agency has erroneously classified a child ...").

▮ Having concluded that Congress acted pursuant to its fourteenth amendment powers, and effectively abrogated the sovereign immunity of the states from suit in federal court, we turn to consider whether the state is amenable to suit in federal court based on alleged violation of state standards which are incorporated into the federal Act. The State relies on *Pennhurst II* for its position that the eleventh amendment proscribes federal courts from interpreting and enforcing state substantive standards that have been incorporated into the federal Act.

▮ In *Pennhurst II,* however, the federal courts sought to provide relief on the basis of *pendent* state law claims. *See* 104 S.Ct. at 905, 910. In the EHA context, as we noted previously, no pendent state claim will lie. *See Burlington II* at 788. Relief in federal courts must be sought and awarded only on the basis of the EHA, which includes, as we have determined, state substantive standards which are consistent with, but more exacting, than the provisions of the federal Act. This approach has been confirmed by the Supreme Court in *Smith v. Robinson:*

The District Court purported to award relief on the basis of state law. In light of the decision in *Pennhurst [II],* that was improper. The propriety of the injunctive relief, however, is not at issue here. *We think that the Court of Appeals [for the First Circuit] was correct in treating the relief as essentially awarded under the EHA, since petitioners had challenged the State Commissioner's construction of state law on the basis of their rights under the EHA*

.... It is clear that the EHA creates a right, enforceable in federal court, to the free appropriate public education required by the statute. *Board of Education v. Rowley*, 458 U.S. 176 [102 S.Ct. 3034, 73 L.Ed.2d 690] 20 U.S.C. § 1415(e)(2).

104 S.Ct. at 3464 n. 6 (emphasis added). Thus, under the EHA, which employs the unusual system whereby the state-federal review apparatus, procedure, and standards are intertwined from the initial complaint until the final decision, the intertwined body of law is applicable to EHA cases regardless of the court chosen for the appeals process. *Pennhurst II* speaks not to this situation but proscribes federal courts from requiring states to conform their conduct to state law *qua* state law.

C

■■■ We now turn to the district court's decision, which we have no difficulty affirming in its entirety. The overwhelming evidence showed that a change in David's IEP was warranted. The district judge carefully reviewed the administrative findings, received additional evidence, and discussed David's needs as a unique individual, rather than as an abstract representative of the category of children with Down's syndrome. She found that while David was making progress in some of the academic areas within the Dartmouth School Committee's classroom, his inappropriate sexual behavior continued unabated and posed a serious threat to David's ability to live in the community. The importance of "maximizing [David's] potential for eventual placement in a community-based program or private employment" had already been identified by the state hearing officer as an appropriate objective of the IEP.

The district judge was especially concerned that, although David had performed relatively well in the rather cloistered and familiar environment of the school he had been attending for several years, in less familiar situations, or where relatively unsupervised, he frequently showed little or no self-control in his conduct towards other persons. The court pointed to a variety of situations where this had occurred, including David's being sent home from a camp for handicapped youths, and his rejection from other programs. The court was especially concerned because some of the special education experts who evaluated David regarded his lack of self-control and related behavior grave enough to warrant rejection of him from developmentally disabled service programs, and predicted that he would not be admitted to sheltered workshops for employment or community-based programs. As the court concluded, the evidence uniformly shows that the behavior problem in unstructured or unfamiliar situations has become less controlled over the past two years in the Dartmouth Schools rather than improved.

. ■■■ The district court also found that since Massachusetts law mandated a level of substantive benefits superior to that of the federal Act, the state standard would be utilized as determinative of what was an "appropriate" education for the child. The court noted that the Massachusetts Supreme Judicial Court "in a recent decision interpreted [state education law] as requiring the Department of Education to administer special education programs 'to assure the maximum possible development of a child with special needs.' *Stock v. Massachusetts Hospital School*, 392 Mass. 205, 211 [467 N.E.2d 448] (1984)." Since both the federal and state Acts require that education be provided in the least restrictive environment, *see* 20 U.S.C. § 1412(5); Mass.Admin.Code tit. 603, § 110.0, the district court stated the issue as "whether Dartmouth's IEP addresses plaintiff's special educational needs so as to assure his maximum possible development in the least restrictive environment consistent with that goal." We think that the court both phrased and answered the question correctly.[8]

---

8. We do not construe the federal Act to codify the State's standard and render it immune from state revision. Should the highest state court, the legislature, or other governmental unit em-

## IV. PLAINTIFF'S CROSS–APPEAL

We need not tarry long over plaintiff's cross-appeal. He presents two issues. He first contends that the district court erred in declining to reach the question whether some of the Town's procedures regarding the writing of his IEP, and the administrative appeals process, were out of compliance with the State and federal regulations. Secondly, plaintiff claims that the district court erred in not ordering the Dartmouth Schools to reproduce within its school system the services that would have been provided to him at the private residential school which was filled and unable to accept him at the time the court decision was issued.

■■■■■ As for procedural errors, we note that plaintiff failed to bring up the question at the administrative hearing. Because the district court's role in an EHA case is to provide "something short of a trial *de novo*," *Colin K. v. Schmidt*, 715 F.2d at 5, and can best be characterized as conducting a review proceeding, we have previously held that for issues to be preserved for judicial review they must first be presented to the administrative hearing officer. *Id.; see also Burlington II* at 781. Accordingly, this issue is not properly before us.

■■■■■ In regard to plaintiff's second issue, the district court directed that the parties attempt to negotiate a solution to David's scholastic limbo and declined to issue any interim orders until such negotiation was completed. While "delay in resolving matters regarding the educational program of a handicapped child is extremely detrimental to his development," 121 Cong.Rec. 37416 (Nov. 19, 1975) (remarks of Act's principal author), *Burlington II* at 800, the Act also prefers that IEPs and by extension, interim services, be a product of good-faith cooperation and negotiation among the parties. *Id.* at 799. We are

troubled that the program the district court ordered for David was unavailable at the time of the decision and order properly appealed here, and that no similar school could be located for him. But our concern does not allow us to transgress the strictures of our appellate jurisdiction. Because the district court has not issued any final order on plaintiff's motion for enforcement and the provision of interim services, we cannot hear the appeal under 28 U.S.C. § 1291 jurisdiction. Accordingly, plaintiff's cross-appeal is dismissed; the first issue with prejudice, the second without prejudice.

*The district court's judgment is affirmed.*

TORRUELLA, Circuit Judge (dissenting).

The facts of this case, which are adequately covered in the court's opinion, present an emotive situation. Unfortunately the binding provisions of the Eleventh Amendment prevent me from joining the majority in concluding that David D. has an enforceable cause of action in a *federal court* against the Commonwealth of Massachusetts. *See Pennhurst State School v. Halderman, (Pennhurst II)*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Atascadero State Hospital v. Scanlon*, — U.S. ——, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985).

Assuming the validity of circumventing *Pennhurst II* through the "incorporation by reference" doctrine enunciated in *Town of Burlington v. Department of Education*, 736 F.2d 773, 778 (1st Cir.1984), this proposition is sustainable only if it meets the high standards established by *Atascadero* for overriding the Eleventh Amendment.[1] There, as in the present case, reliance was made upon vague legislative history and general statutory language for the proposition that a federal statute, the Rehabilitation Act of 1973 (87

---

powered to act revise the applicable state law, the federal courts will use the standards as amended.

1. Congress may override Eleventh Amendment immunity when acting pursuant to its authority under the Fourteenth Amendment, Section Five. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 453–56, 96 S.Ct. 2666, 2670–71, 49 L.Ed.2d 614 (1976).

Stat. 384, as amended), had superseded the state's immunity from suit in federal court. The Court in unusually stringent language restated the rule that had been emerging from *Pennhurst II* and *Quern v. Jordan*, 440 U.S. 332, 342, 99 S.Ct. 1139, 1146, 59 L.Ed.2d 358 (1979):

> Congress may abrogate the State's constitutionally secured immunity from suit in federal court *only by making its intention unmistakably clear in the language of the statute.* The fundamental nature of the interests implicated by the Eleventh Amendment dictates this conclusion.

—— U.S. at ——, 105 S.Ct. at 3148 (emphasis supplied).

Because I believe that the present situation under the Education for the Handicapped Act, 20 U.S.C. § 1401 *et seq.*, is indistinguishable[2] from that in *Atascadero* under the Rehabilitation Act, and because, as in *Atascadero*, there is lacking unmistakably clear intention in the language of this legislation to submit the Commonwealth of Massachusetts to suit in federal court for violation of its statutes, I dissent. *See also Miener v. Missouri*, 673 F.2d 969, 981 (8th Cir.1982).

---

**2.** *See Chardón v. Fernández,* 454 U.S. 6, 8, 102 S.Ct. 28, 29, 70 L.Ed.2d 6 (1981).