Joanne ALINOVI, Plaintiff, Appellant,

v.

WORCESTER SCHOOL COMMITTEE,
et al., Defendants, Appellees.

No. 84–1172.

United States Court of Appeals,
First Circuit.

Argued Aug. 18, 1984.

June 28, 1985.

As Amended Dec. 6, 1985.

James A. Toomey, Braintree, Mass., with whom Murphy, Lamere & Murphy, Braintree, Mass., was on brief, for defendants, appellees.

Before CAMPBELL, Chief Judge, BOWNES, Circuit Judge, and PEREZ–GIMENEZ,* District Judge.

PEREZ–GIMENEZ, District Judge.

Joanne Alinovi, a teacher at Midland Street School, in Worcester, Massachusetts, brought this action against the Worcester School Committee ("School Committee"), its members, and the Superintendent of the Worcester Public Schools to redress alleged deprivations of her free speech and privacy rights as guaranteed to her by the First, Fourth and Fourteenth Amendments to the United States Constitution. She asserted a cause of action under 42 U.S.C. § 1983, claiming deprivations of her constitutional rights under color of state law and sought declaratory, injunctive, and other equitable relief and damages. Jurisdiction was invoked under 28 U.S.C. §§ 1331 and 1343.

In essence, Alinovi claimed, first, that defendants violated her Fourth Amendment privacy right when they disciplined her for refusing to give a copy of a paper she had written about a student in her class to her school principal, and second, that her First Amendment right to free speech was violated when defendants disciplined her for posting in her classroom on Parents' Night certain letters she had received from the administration concerning her refusal to give the term paper to the principal.

After a jury-waived trial, the United States District Court for the District of Massachusetts found that defendants did not violate either Alinovi's Fourth Amendment privacy right or her First Amendment free speech right, and ordered that judgment be entered in favor of defendants.

For the reasons set forth below, we affirm.

Darragh K. Kasakoff, Worcester, Mass., with whom Seder & Chandler, Worcester, Mass., was on brief, for plaintiff, appellant.

* Of The District of Puerto Rico, sitting by designation.

## I. FACTUAL AND PROCEDURAL BACKGROUND [1]

Joanne Alinovi has been a tenured public school teacher in Worcester since 1971. Between September 1971 and May 1980 she taught fourth grade at Midland Street School. Since September 1978, the Principal at Midland Street School has been William Bombard.

The Legislature of Massachusetts has established a comprehensive statutory scheme for the provision of special education services to residents of the State. *See,* Mass.G.L. c. 71B.[2] Pursuant to the statutory scheme, the school committee of each school district in Massachusetts must identify those children in its schools who have special needs, *i.e.,* emotional or physical problems that prevent a child from progressing effectively in a regular school program. The school committee must then evaluate the child's needs and develop a program of special education to meet those needs. At any time during the year a parent, a teacher, or a principal may initiate testing, evaluation and a conference among the classroom teacher, principal, parents, and other school professionals to develop a special program for the child. This is called a core evaluation.

During the 1978–79 school year, Alinovi had four special needs students in her class. One of her special needs students that year was Chris. In the fall of 1978, Principal Bombard, Alinovi, Chris's mother, the school psychologist and the special education teacher developed a program for Chris which required him to attend two half-hour sessions weekly outside the regular classroom with a special needs teacher and to periodically visit the school adjustment counselor for counseling.

During the fall of 1978 and January 1979, Alinovi had a lot of trouble with Chris in the classroom. Chris was hyperactive, would fight with other students, melted crayons on the radiator, and once threatened to jump out of a window. On another occasion Chris held a knife to his throat. Alinovi spoke with Principal Bombard about her problems with Chris, but the Principal told her that he was too busy to deal with Chris's problems. Alinovi talked to other people about Chris, including Mr. Generelli, the supervisor of special education at Midland Street School. After speaking to Mr. Generelli, Alinovi decided to request a re-evaluation for Chris to modify his special needs program; and she did so on February 1979.

During March and April of 1979, Alinovi took on her own time an extra credit evening course on "Mental Health in Education" at Worcester State College. To fulfill her course's term paper requirement, she wrote a case study of Chris. The term paper contained some criticism of Bombard's handling of Chris and of his dealing with Alinovi. However, other than referring to Chris by his first name only, the paper did not identify any person or place by name. When Alinovi gave the paper to her professor for grading, she expected that the paper would be discussed and would be an educational benefit to the professor. Although she testified during trial that she did not expect that the paper would be given to anyone in the Worcester public school system, she took no steps to insure that her professor did not copy the paper, and she imposed no conditions to maintain it as a private or confidential document.

On May 31, 1979, Alinovi, Bombard, Chris's parents, Mr. Generelli and other school professionals met at Midland to re-evaluate Chris's special needs program. In preparation for this meeting, each profes-

---

**1.** The following summary of facts is drawn extensively from the detailed findings of fact made by the district court after the conclusion of a two-day, non-jury trial. We note that appellant Alinovi has not contested the findings of fact of the district court and, in fact, draws heavily from said findings in her own statement of facts in her appellate brief.

**2.** For a general description of the statutory and regulatory scheme which applies to special needs education, see *Isgur v. School Committee of Boston,* 9 Mass.App.Ct. 290, 400 N.E.2d 1292 (1980). *See generally, Stock v. Massachusetts Hospital School,* 392 Mass. 205, 467 N.E.2d 448 (1984); *City of Boston v. Board of Education,* 392 Mass. 788, 467 N.E.2d 1318 (1984).

sional, including Alinovi, had prepared a written report on Chris's progress, which he or she had given in advance to the other participants and which formed part of Chris's official record. Alinovi also brought her term paper with her to the conference. Believing that the term paper contained helpful details about Chris and that Mr. Generelli, as conference chairman, was the person ultimately responsible for approving an educational plan for Chris after the meeting, Alinovi gave him the term paper before the meeting started. Mr. Generelli placed the term paper in his briefcase and never looked at it.[3] Alinovi did not read from or refer to the paper during the conference. At the end of the conference, Chris's parents decided to keep Chris's current educational program and signed a form to that effect. Realizing that Mr. Generelli would not need her term paper after all, Alinovi got the paper back from him.

The next day, June 1, 1979, the principal stopped Alinovi in the school corridor and asked to see her term paper. Because she did not want Bombard to read her criticism of him and because she felt it was her private paper, Alinovi refused to give it to him and told him that he already had all the relevant information about Chris. Thomas Friend, who at the time of these events was the Acting Supervisor of Elementary Schools, testified that he and other administration officials thought that Alinovi's case study was part of Chris's official file. Bombard, as principal of the school and as the one responsible for reviewing all of Chris's evaluation materials, felt duty-bound to see the paper.

Subsequently, on June 13, 1979, Alinovi received a letter from Thomas Friend asking her to meet with him and Bombard on June 19 to discuss her refusal to turn over her term paper. The letter stated that the meeting could result in disciplinary action against her. Alinovi attended the meeting accompanied by her lawyer, and the four discussed why she had refused to turn over her paper. Both Mr. Friend and Mr. Bombard told Alinovi that they considered her refusal to turn over her paper as insubordination. Alinovi, knowing that insubordination would be grounds for firing a tenured teacher, allowed her attorney to give the case study to the administration officials. At the end of the meeting, Friend told Alinovi that he would get back to her in about a week's time regarding any possible disciplinary action. However, the matter was not resolved within a week, and on June 28, 1979, the administration wrote Alinovi informing her that they were postponing any further meetings until the fall. Alinovi spent her summer vacation in Maine, under a good deal of stress because she was worried about what action the administration would take against her. During the summer, Alinovi sought psychological counselling.

Upon her return to school in September 1979, Alinovi received no word from the administration until October 3, when she got another letter informing her of a meeting to be held on October 11 with Superintendent Connor, Assistant Superintendent David St. John, Mr. Friend and Principal Bombard. This letter again mentioned the possibility of disciplinary action against Ali-

---

**3.** Alinovi testified during the trial that she expected Mr. Generelli to take all the information which had been brought up during the conference home with him and then make a decision concerning Chris's educational plan on the basis of what he had heard and read. She also stated that she told Mr. Generelli that her case study contained more information about Chris which would be helpful to him in making his decision. She further testified that Mr. Generelli initially hesitated to take the paper, but that he then gave in and took it after she told him that he could read the paper at his leisure to gain more insight into the case. Finally, Alinovi testified

that Mr. Generelli took the paper and put it in his briefcase without reading it. (App. 135–136).

We also note that Alinovi testified that when she came into the room where the conference was to be held, Mr. Generelli was "walking towards or standing near the head of the table where he was going to sit." (App. 134). Almost all the participants had arrived before Alinovi entered the library. (App. 133). Principal Bombard testified, upon a question posed to him by the court during his direct examination, that he saw Alinovi giving her paper to Mr. Generelli, and heard her tell him that it was a case study on Chris. (App. 310–311).

novi. The meeting was held but did not bring a resolution to Alinovi's problem.

On November 14, 1979, the school held a Parents' Night. The notice that went out to the parents describing the event stated that the teachers would speak to the parents about school programs and what the teachers expected from their students. Alinovi felt that Parents' Night would be a good opportunity to bring to the parents' attention the problem she was having with the school administration and the fact that it was not getting resolved. Accordingly, she posted on her classroom bulletin board, next to the parents' sign-up sheet, the three letters she had received from the administration. She then directed the parents to the sign-up sheets. On one of the letters, she wrote: "the meeting was held and I have received no communications regarding the matter since. So far this has cost me $60.00 in psychological counseling fees and hundreds of dollars in attorney's fees." During the question-and-answer period following Alinovi's presentation to the parents, two out of seventeen questions concerned the posted letters. One parent asked what the letters were about and Alinovi told him that he would have to contact the writers since she could not say anything more about them. Another parent asked whether the problem was affecting her teaching, to which Alinovi responded affirmatively because in her free time she thought about the problem in the letters instead of thinking of ways to improve her teaching. Apparently, one parent could not understand why the letters had been posted and complained to the President of the Parents' Club, who in turn spoke to Principal Bombard.

At trial, Alinovi testified that her purpose in posting the letters was to bring about a resolution of her disciplinary problem and to inform the parents of the effect the administration's inaction was having on her teaching. However, the district court entered a finding to the effect that Alinovi was actually trying to, and did, accomplish only the former objective. The court also found that Alinovi simply wanted to get the parents interested in her problem hoping that they would approach the administration, which would then be embarrased and would act on Alinovi's disciplinary matter.

On November 30, 1979, Alinovi received a letter from Superintendent Connor, in which he found Alinovi insubordinate for her refusal to give her term paper to the principal. The letter was to remain in her personnel file permanently. After two more meetings with the administration, on December 17, 1979, and March 7, 1980, Superintendent Connor suspended Alinovi without pay for two days because of the November 14, 1979, posting incident, which he described as "conduct unbecoming a teacher". The Superintendent also informed Alinovi that he would recommend to the School Committee that she be involuntarily transferred from the fourth grade at Midland to a LAMP position for the remainder of the 1979–80 school year, a position which involves teaching remedial math to small groups.

On May 1, 1980, the Worcester School Committee voted to involuntarily transfer Alinovi to the Curriculum Center, where she stayed until the end of the school year in June 1980. Alinovi's first assignment there was to outline fifty textbooks. This task took her about a week, after which she read most of the time, having nothing else to do. Alinovi was isolated at the Curriculum Center, and the stress she was under caused her to seek psychiatric counseling during May and June 1980.

In September 1980, Alinovi reported back to the Curriculum Center. During the 1980–81 school year, the administration transferred her back and forth between the Center and short-term substitute teaching positions six times. Due to the stress of the transfers, Alinovi had to take 40 days sick leave and to seek counseling several times during the year. At the end of the 1980–81 school year, Alinovi requested and received a year's unpaid leave of absence. Since she started to feel better emotionally during this year, Alinovi decided to return to teaching on the fall of 1982. From that time until the present, she has taught at

the Chandler Elementary School in the Worcester System. She has sought no further counseling since she returned to work and seems happy with her present teaching position.

On June 25, 1980, Alinovi filed the present action in the federal district court alleging that defendants' conduct had deprived her of her constitutional rights. First, she claimed that she had a Fourth Amendment privacy interest in her case study about Chris and that defendants infringed her Fourth Amendment rights when they disciplined her for refusing to give her term paper to the Principal of her school. Second, she claimed that the First Amendment protected her right to post the letters from the administration at Parents' Night, and that defendants could not discipline her for posting said letters.

The district court, in an unpublished opinion, denied Alinovi relief, reaching the following conclusions: 1) that after Alinovi brought her term paper to Chris's core evaluation meeting on May 31, 1979, she could no longer claim an expectation of privacy in that paper; 2) that since plaintiff Alinovi had no Fourth Amendment privacy interest in her paper, any disciplinary action that resulted from her refusal to turn over the paper did not violate her constitutional rights; and 3) that since Alinovi's posting of the administration letters on Parents' Night was not speech on a matter of public concern, the defendants did not have to justify to the court any employment decisions they made in reaction to the posting incident. This appeal followed.

## II. FOURTH AMENDMENT CLAIM

On appeal, Alinovi renews her argument that she had a privacy interest in her term paper and that consequently she had a Fourth Amendment right to be free from unreasonable seizures of her private papers. She further argues that even if she had initially consented to a "search or seizure" of her private paper, she subsequently withdrew said consent and reinvoked her Fourth Amendment right. We disagree with both of these contentions.

We note initially that in referring to the alleged invasion of privacy by the school officials, Alinovi sometimes calls it a "search" and other times a "seizure". It is thus unclear whether she is claiming a Fourth Amendment violation due to an unreasonable "search" or an unreasonable "seizure". The Supreme Court has defined these terms as follows: "[a] 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interest in that property." *United States v. Jacobsen*, 466 U.S. 109, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984). However, regardless of how Alinovi chooses to characterize the alleged intrusion of her privacy— *i.e.*, whether her paper was "searched" or "seized"—we believe that the crux of this case lies in determining whether Alinovi can claim a reasonable expectation of privacy in her term paper. Depending upon our answer to this question, we will be able to tell whether there was a violation of the Fourth Amendment in this case.

The first clause of the Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Supreme Court has emphasized that the primary object of this amendment is to "safeguard the privacy and security of individuals against arbitrary invasions by government officials." *Camara v. Municipal Court*, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967). Moreover, the Court has observed that "[i]f the government intrudes on a person's property, the privacy interest suffers whether the government's motivation is to investigate violations of criminal law or breaches of other statutory or regulatory standards." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312–13, 98 S.Ct. 1816, 1820–21, 56 L.Ed.2d 305 (1978). Consistent with these principles, the Supreme Court has extended Fourth Amendment protection beyond the "paradigmatic entry" into a house by police offi-

cers in search of criminal evidence to civil investigations of business premises. *Michigan v. Tyler*, 436 U.S. 499, 504, 98 S.Ct. 1942, 1947, 56 L.Ed.2d 486 (1978). Accordingly, the Fourth Amendment has been held applicable to activities of civil as well as criminal authorities. *See, e.g., Marshall v. Barlow's, Inc., supra; Camara v. Municipal Court, supra. See v. City of Seattle*, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967).

 Furthermore, it is now beyond dispute that the Fourth Amendment, by virtue of the Fourteenth Amendment, prohibits unreasonable searches and seizures by state officers. *New Jersey v. T.L.O.*, — U.S. —, 105 S.Ct. 733, 739, 83 L.Ed.2d 720 (1985) (citing *Mapp v. Ohio*, 367 U.S. 643 (1961); *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960); *Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949)). Equally indisputable after *T.L.O.*, is the proposition that the Fourth Amendment applies to searches of students conducted by public school officials. 105 S.Ct. at 739–41. Just as students are protected by the Fourth Amendment, teachers are also entitled to the amendment's protection against unreasonable searches by school officials. *See, Gillard v. Schmidt*, 579 F.2d 825, 828 (3d Cir.1978) (public school guidance counselor alleging a search of his desk by a school board member properly alleged a violation of the Fourth Amendment). However, in assessing the reasonableness of a job-related search or seizure by a supervisor relative to a government employee, a court will take into account the supervisor's legitimate oversight responsibilities and the special duties that may be owed by the employee by virtue of his employment.[4] The employee's protected privacy interest may be less in such circumstances.

At bottom, "[w]hether the Fourth Amendment's prohibition against unreasonable searches and seizures has been violated depends on whether the person asserting a Fourth Amendment violation had a reasonable expectation of privacy in the place searched or the thing seized." *United States v. Thornley*, 707 F.2d 622, 624 (1st Cir.1983) (citing *United States v. Hershenow*, 680 F.2d 847, 855 (1st Cir.1982)). *See also, Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978) (discussing *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). Thus, given the facts here, the basic question is whether Alinovi had a reasonable expectation of privacy in her term paper.

In *Smith v. Maryland*, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), the Supreme Court, adopting Justice Harlan's statement of the rule in his concurrence in *Katz v. United States*, 389 U.S. at 360–62, 88 S.Ct. at 516–17, announced a two-step test for determining whether a reasonable expectation of privacy exists. The first question is:

whether the individual, by his conduct, has "exhibited an actual (subjective) expectation of privacy", 389 U.S., at 361 [88 S.Ct. at 516]—whether, in the words of the *Katz* majority, the individual has

---

**4.** *See United States v. Nasser*, 476 F.2d 1111, 1123 (7th Cir.1973) (electronic surveillance of IRS employee to verify whether he was properly performing IRS work in his IRS office not unreasonable); *United States v. Collins*, 349 F.2d 863, 867–68 (2d Cir.1965) (search of Customs employee's desk and work area for missing package "was a constitutional exercise of the power of the Government as [his] employer, to supervise and investigate the performance of his duties as a Customs employee"), *cert. denied*, 383 U.S. 960, 86 S.Ct. 1228, 16 L.Ed.2d 303 (1966); *see also United States v. Kahan*, 350 F.Supp. 784, 793 (S.D.N.Y.1972) (dictum) (government supervisor may inspect work area of subordinate to evaluate his job performance),

*rev'd on other grounds*, 479 F.2d 290 (2d Cir. 1973), *rev'd per curiam*, 415 U.S. 293, 94 S.Ct. 1179, 39 L.Ed.2d 297 (1974); *cf. Gardner v. Broderick*, 392 U.S. 273, 278, 88 S.Ct. 1913, 1916, 20 L.Ed.2d 1082 (1968) (dismissal of public employee for refusal to answer questions narrowly related to his official duties not violative of fifth amendment); *Biehunik v. Felicetta*, 441 F.2d 228 (2d Cir.) (police commissioner may, consistent with the fourth amendment, order 62 policemen, upon pain of discharge, to appear in a lineup before civilians who allege that they were victims of a police assault, since reasonably related to performance of police duties), *cert denied*, 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971).

shown that "he seeks to preserve [something] as private." *Id.,* at 351 [88 S.Ct. at 511]. The second question is whether the individual's subjective expectation of privacy is "one that society is prepared to recognize as 'reasonable,' " *Id.,* at 361 [88 S.Ct. at 516]—whether, in the words of the *Katz* majority, the individual's expectation, viewed objectively, is "justifiable" under the circumstances. *Id.,* at 353 [88 S.Ct. at 512]. *See, Rakas v. Illinois,* 439 U.S. at 143–44 n. 12 [99 S.Ct. at 430–31 n. 12] (concurring opinion); *United States v. White,* 401 U.S. [745], at 752 [91 S.Ct. at 1126] (plurality opinion).

442 U.S., at 740–41, 99 S.Ct. at 2580–81 (footnote omitted). *See also, United States v. Thornley, supra; United States v. Hershenow, supra.* Applying this test to the case at bar, we must reject, as did the district court, Alinovi's claim to Fourth Amendment protection. The district court, trying the case without a jury, found that Alinovi did not have a reasonable expectation of privacy in her term paper after she brought it to Chris's core evaluation meeting on May 31, 1979. We agree with this conclusion.

 Alinovi fails on both scores of the test set forth in *Smith v. Maryland.* First, Alinovi does not meet the subjective expectation test since we cannot say that she showed any interest in preserving her paper as private. It is true that Alinovi did not want to give her paper to Principal Bombard because it contained criticism of his handling of Chris's situation. However, it is no less true that prior to refusing to give her paper to the principal, she had already given it to her college professor for grading and had voluntarily offered it to Mr. Generelli, a school official, to aid him in his decision-making process regarding Chris's educational program. In fact,

when Alinovi gave the paper to her professor, she expected that the paper would be discussed in class and would be an educational benefit to the professor. Moreover, although she testified that she did not expect her professor would give the paper to anyone in the Worcester school system, she took no steps to insure that the professor not copy the paper and imposed no conditions to maintain it as a private or confidential document.[5] And, most important, she voluntarily offered her paper to the school official responsible for prescribing Chris's educational program, in full view of the other persons responsible for Chris's education. Although she testified that she did not expect Generelli to show her paper to the principal, she recognized that she had no way of knowing whether Generelli would reveal the contents of her paper to Bombard or not. We agree with the district court's conclusion that Alinovi must have obviously expected that someone in the administration would use the information in her term paper. In other words, once Alinovi made the contents of her paper known to Generelli, particularly that it contained helpful information regarding Chris, she could have reasonably anticipated that it would be subject to inspection by concerned school officials, especially in light of the requirement imposed on school authorities by Mass G.L. c. 71B to oversee all aspects of special needs education.[6] Thus, we fail to see how, after giving her paper to her professor and to Generelli, she can still be said to have retained an expectation of privacy in said paper. Although understandably she was hesitant to show her paper to Principal Bombard, she certainly did nothing to preserve it as private, and thus we conclude that Alinovi did not, by her conduct, exhibit a subjective expectation of privacy.

**5.** We do not say that Alinovi's surrendering of her paper to the professor, with the expectation of class discussion, constituted in and of itself an abandonment of privacy rights for use of the paper in another context. Her willingness to share the paper with others in a classroom setting shows only that Alinovi's actual expectations of privacy were not absolute. Her re-duced expectations were most dramatically and most relevantly revealed later on, when she voluntarily handed the paper over to the Supervisor of Special Education at the time of Chris' evaluation, *infra.*

**6.** See note 2, *supra,* and accompanying text.

■ Second, even assuming *arguendo* that Alinovi did harbor some subjective expectation that her paper would remain private, this expectation is not "one that society is prepared to recognize as 'reasonable'." *Katz v. United States*, 389 U.S. at 361, 88 S.Ct. at 516. The case study in issue related to a student with whom Alinovi had come into contact as part of her official teaching duties at the school and for whose special needs program both she and Principal Bombard had direct, job-related responsibilities. Alinovi had clearly indicated that she thought her paper was relevant to the evaluation of Chris's special needs program by handing the paper to Generelli in Principal Bombard's presence at the official school meeting dealing with Chris's program. Given Bombard's supervisory responsibilities, it was understandable that he should insist that a teacher on his staff divulge to him the information and views she had compiled regarding Chris's evaluation. *See* note 6, *supra*. In *Katz*, the Supreme Court expressly held that "what a person *knowingly exposes to the public*, even in his home or office, is not a subject of Fourth Amendment protection." *Id*. 389 U.S. at 351, 88 S.Ct. at 511 (emphasis added). Moreover, the court "consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Smith v. Maryland*, 442 U.S. at 743–44, 99 S.Ct. at 2581–82. *See, e.g.*, *United States v. Jacobsen*, 104 S.Ct. at 1658; *United States v. Miller*, 425 U.S. 435, 442–43, 96 S.Ct. 1619, 1623–24, 48 L.Ed.2d 71 (1976); *Couch v. United States*, 409 U.S. 322, 335–36, 93 S.Ct. 611, 619–20, 34 L.Ed.2d 548 (1973); *United States v. White*, 401 U.S. 745, 752, 91 S.Ct. 1122, 1126, 28 L.Ed.2d 453 (1971). In *Miller*, for example, the Supreme Court held that a bank depositor has no legitimate expectation of privacy in financial information voluntary conveyed to banks and exposed to their employees in the ordinary course of business. The Court emphasized:

> The depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government.... This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.

425 U.S. at 443, 96 S.Ct. at 1624. Thus, the court in *Miller* reasoned that because the depositor had "assumed the risk" of disclosure, it would be unreasonable for him to expect his financial records to remain private. The conclusion which can be drawn from this is that "[t]he Fourth Amendment is implicated only if the authorities use information with respect to which the expectation of privacy has not already been frustrated." *United States v. Jacobsen*, 104 S.Ct. at 1658–59.

■ The prior analysis dictates that Alinovi can claim no legitimate or reasonable expectation of privacy here. As we have seen, Alinovi voluntarily conveyed her paper both to her professor and to a school administrator (Generelli). In so doing, she "assumed the risk" that her professor would reveal to the school authorities, and that Generelli would share with other school administrators, the contents of her paper. Aside from her refusal to show her paper to Principal Bombard because she did not want him to read the criticism of him and because she felt it was her private paper, Alinovi did nothing to preserve the paper as a confidential or private document. Moreover, it is settled that a legitimate expectation of privacy means more than a subjective expectation of keeping incriminating evidence hidden. *United States v. Thornley*, 707 F.2d at 624; *United States v. Hershenow*, 680 F.2d at 855. *See, Rakas v. Illinois*, 439 U.S. at 143–44 n. 12, 99 S.Ct. at 430–31 n. 12. Thus, after having exposed her paper to third parties—one of whom was in fact a member of the school administration charged with the education of Chris, the subject of her term paper—we do not see how Alinovi

could have reasonably expected her paper to remain private. The Fourth Amendment is therefore not implicated here because Alinovi frustrated whatever expectation of privacy she could have had in her paper.

■ Alinovi argues, however, that because Generelli returned the paper to her after the meeting without having read it, she still had an actual, subjective expectation of privacy with respect to the paper. Citing *Mason v. Pulliam,* 557 F.2d 426 (5th Cir.1977), she claims that although she might have waived her Fourth Amendment right to privacy when she gave her paper to Generelli, her right was subsequently reinvoked when the paper was returned to her and the purpose of the core evaluation meeting had been fulfilled. We believe that this argument misses the point. Obviously, if Generelli had read the paper Alinovi would not have had any further expectation of privacy in the paper. However, Alinovi not only gave the paper to Generelli but also specifically told him that it was about Chris and that it contained information that would be helpful to him in understanding Chris's problems and prescribing an educational plan for him. Thus, we believe that whether Generelli read the paper or not makes no difference here since Alinovi had already frustrated her privacy expectation by voluntarily and unconditionally giving her paper first to her professor and then to Generelli. We do not see how Alinovi can now claim that the paper was her private property when she did little, if anything, to preserve it as private.

Moreover, Alinovi's reliance on *Mason v. Pulliam,* is misplaced. In *Mason,* a taxpayer voluntarily complied with an IRS request to produce documents. Within a week, the taxpayer changed his mind and demanded that the IRS return his documents. When the IRS refused, the taxpayer brought an action requesting the district court to order a return of the documents. The district court granted the relief, and the Fifth Circuit affirmed holding that when the basis for a search or seizure is consent the government must conform to the limitations placed upon the right to

search or seize by the taxpayer. The court emphasized that unless there is an agreement as to the duration of the search, the taxpayer retains the right to withdraw his consent and reinvoke his constitutional rights. However, the Fifth Circuit specifically stated that the withdrawal of consent and reinvocation of the Fourth Amendment rights did not affect the validity of the IRS's actions *prior* to the time it received notice that its right to retain Mason's documents was gone, and affirmed the district court's refusal to require the return of copies made *prior* to the demand for return of the documents. Obviously, once Mason had consented to inspection by the IRS of his tax records, he frustrated his expectation of privacy and could not claim a violation of his Fourth Amendment right to privacy, at least as to those documents which the IRS had examined and copied *prior* to Mason's demand for return.

In any event, we believe that the Fifth Circuit's rationale in *Mason* may have been undermined by the Supreme Court decision in *Illinois v. Andreas,* 463 U.S. 765, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983). In *Andreas,* the court clarified when a search subject to the Fourth Amendment occurs. In that case, a lawful customs inspection of a container revealed that it contained unlawful drugs. After being so notified, police resealed the container and delivered it to the addressee, who took possession of it. Shortly thereafter, the police seized the container and opened it without obtaining a warrant. The court held that the reopening did not constitute a "search" within the intendment of the Fourth Amendment, because once its contents were initially exposed, any protected privacy interest in the container lapsed. An important principle emphasized by the court in *Andreas* is that for there to be a "search" within the meaning of the Fourth Amendment, there must be an infringement of a legitimate expectation of privacy. The court explained that reopening the container did not intrude on any legitimate expectation of privacy and thus did not violate the Fourth Amendment. *See also, United States v. Jacobsen,* 104 S.Ct. at 1660. Applying this prin-

ciple to the case at bar would only reinforce our conclusion that there was no violation of the Fourth Amendment here inasmuch as, as we have seen, any reasonable expectation of privacy Alinovi may have held in her term paper was extinguished when she exposed its contents to her professor and to a school official so that there was no "search" within the meaning of the Fourth Amendment.

■ In the case at bar, we have already seen that Alinovi lost whatever expectation of privacy in her paper she may have claimed when she unconditionally gave it to her professor and, more importantly, when she gave it to Generelli and informed him of its contents, particularly that it contained information that would help him prescribe Chris's educational program. Thus, after that point there could be no reasonable or legitimate expectation of privacy to support Alinovi's Fourth Amendment claim. We, therefore, conclude that Alinovi in all probability entertained no actual expectation of privacy in the term paper, and that, even if she did, her expectation was not legitimate. The district court was correct in holding that since Alinovi did not have a Fourth Amendment privacy interest in her paper, any disciplinary action that resulted from her refusal to turn over the paper did not violate her constitutional rights.

## III. FIRST AMENDMENT CLAIM

On this appeal, Alinovi also raises as error the district court's conclusion that the posting of the administration letters on her classroom bulletin board during Parents' Night was not protected speech under the First Amendment. The district court specifically found that Alinovi's purpose in posting the letters was to bring about a resolution of her own disciplinary problem. Consequently, citing *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the court held that Alinovi's action was not speech on a matter of public concern, and, thus, the School Committee's reaction thereto did not have to be justified to the court. We believe that the district court was correct in its reliance on *Connick*, and therefore affirm its dismissal of Alinovi's First Amendment claim.

*Connick* was a case in which an assistant district attorney, after becoming upset with an involuntary transfer, distributed a questionnaire concerning employment policies of the district attorney's office. When she was subsequently terminated, allegedly because of her refusal to accept the transfer and because her distribution of the questionnaire was considered an act of insubordination, she brought an action under 42 U.S.C. § 1983 claiming that she was wrongfully discharged because she had exercised her constitutionally protected right of free speech. Recognizing the right of public employees to comment on matters of public concern, *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Supreme Court concluded that "[w]hen employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." 461 U.S. at 146, 103 S.Ct. at 1689. The Court went on to hold specifically that

> [w]hen a public employee speaks not as a citizen upon matters of public concern, *but instead as an employee upon matters only of personal interest*, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

*Id.* at 147, 103 S.Ct. at 1690 (emphasis added). Thus, the Court rejected Myers' claim to protection by the First Amendment in view of its conclusion that her speech concerned only her dissatisfaction with her own employment situation.

■ Applying the reasoning in *Connick* to the case at bar, we agree with the district court that Alinovi's posting of the administration letters on Parents' Night

cannot be considered speech on a matter of public concern and is therefore not protected by the First Amendment. The fact, as found by the district court and not contested by Alinovi, is that Alinovi is interested simply in getting her own disciplinary problem resolved. In light of Supreme Court precedent in this area, we do not think that the resolution of a pending personnel problem between a public school teacher and her employer is a matter of public concern. *See, e.g., Connick, supra* (questions of confidence in supervisors, office morale and need for a grievance committee are not issues of public concern, but question regarding pressure upon public employees to work on political campaigns is an issue of public concern); *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979) (school district's allegedly racially discriminatory policies are of public concern); *Perry v. Sinderman,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (testimony before state legislature on whether a two-year state college should become a four-year college is protected by First Amendment); *Pickering, supra,* (Board of Education's allocation of money between athletics and education is issue of public concern).

Finally, in what amounts to a last minute attempt to come within the holding of *Connick,* Alinovi argues that her speech concerned the public issue of her Fourth Amendment rights and is thus protected by the First Amendment. This attempt must necessarily fail because, as we have seen, when she posted the letters on Parents' Night she was not concerned with any possible violation of her Fourth Amendment rights, but rather, with the purely personal issue concerning the lack of action on the part of the administration regarding her disciplinary problem. Thus, since we agree with the district court that Alinovi's posting of the administration letters was not speech on an issue of public concern, we conclude that the district court was correct

in holding that the School Committee need not justify to the court any employment decision made by them regarding Alinovi in reaction to the posting incident.

The judgment of the district court is *Affirmed.*

BOWNES, Circuit Judge (dissenting).

The majority has held that a student who gives a paper to a professor in the course of academic study has no expectation of privacy in that paper. Then they go on to rule that an employer may demand production of a personal paper its employee believes to be private if they think the paper contains information that is relevant to her work. The court also holds that an individual who offers a paper to a third party, changes her mind, and obtains the paper back before it has been read has no expectation of privacy because she has "exposed" the paper to public view. I believe that in arriving at its decision the majority has incorrectly analyzed the fourth amendment claim and, as a result, has run roughshod over core fourth amendment protections against unreasonable searches and seizures of private papers and has rendered an opinion that threatens first amendment protections given to academic freedom of inquiry and expression.

To decide whether an individual possesses a legitimate expectation of privacy the court must determine whether the individual has a subjective expectation and then whether the individual's subjective expectation of privacy is one that society is prepared to recognize as reasonable. *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979).

## I. PRIVACY INTEREST IN ACADEMIC PAPER [1]

### A. *Subjective Interest*

The majority has found, contrary to the district court and the record, that Alinovi

---

**1.** I consider the private nature of the paper to include the particular embodiment of the Alinovi's thoughts as well as her interest in not re-

vealing her personal feelings about her principal and her teaching philosophy. *See Harper and Row v. Nation Enterprises,* — U.S. —,

had no subjective interest in the privacy of the contents of her paper after she submitted it to her professor at Worcester State College.[2] After securing permission from Chris' mother to study Chris and after assuring her that confidentiality would be protected, Alinovi wrote her graduate school assignment using only Chris' first name. In order to preserve the confidentiality of other persons referred to in her paper, including the principal and herself, Alinovi deleted the names of all school personnel and did not identify the name of the school or the town in which the school is located. Although the majority of the court found that, "when Alinovi gave the paper to the professor she expected that the paper would be discussed in class ...," the record contains no basis for this assertion. Rather, Alinovi testified that she expected that the paper might add to her professor's knowledge in the field of mental health, and that the professor might take the knowledge of this case, add it to her knowledge of other cases, and use the accumulated knowledge for discussion in future courses. There is also nothing in the record that contradicts Alinovi's testimony that she submitted the paper to her professor at Worcester State College with the expectation that it would not be given to Midland Street School authorities, the only people who would be able to identify the writer or individuals referred to in the paper. After grading it, her college professor returned the paper to Alinovi.

The majority stresses that Alinovi did not tell her professor that the paper could not be copied or shared with others. In light of the fact that federal law protects the privacy of academic work, this was not necessary. Students' privacy expectations are protected by the Family Education and Privacy Rights Act (the Buckley Amendment to the General Education Provisions Act) which provides that federal funds

shall be withdrawn if a school or university reveals records containing identifying data, including academic work, to persons outside the university without a student's consent. *See* 20 U.S.C. § 1232g (1982); Act of Dec. 31, 1974, Pub.L. No. 93–568, 1974 U.S. Code Cong. & Ad.News 6779. Thus, Alinovi's belief that her professor would keep her paper private was entirely consistent with the normal expectations of students and teachers and in keeping with university policy in clinical educational settings. *See, e.g., Harvard Law School Advisor* 19–22 (Aug. 30, 1984); *Cooperative Legal Education Handbook,* Northeastern University School of Law 16–17 (Dec. 1984). I must, therefore, disagree with my colleagues that Alinovi had no subjective privacy interest in her academic paper after she submitted it to her college professor.

### B. *Societal Recognition of Privacy Interest in Academic Paper*

In order for an individual's subjective expectation of privacy to be protected by the Constitution, the expectation must be one that "is recognized and permitted by society." *Smith v. Maryland,* 442 U.S. at 740, 99 S.Ct. at 2580; *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). The majority appears to find that even if Alinovi did have a subjective expectation of privacy in her paper before she brought it to Midland school, society will not recognize her privacy interest because the paper contained information that Midland school authorities believed might be relevant in developing and implementing Chris' educational program. In finding "relevance to an employer" to be the test for abrogating an individual's privacy interest, I believe the majority casts far too wide a net: innumerable personal writings might be thought to be relevant, at least in

---

——, 105 S.Ct. 2218, 2228, 85 L.Ed.2d 588 (1985) (distinguishing first amendment right of privacy in choice of words from suppression of facts).

**2.** Although the district court did not make a finding of fact on this precise question, it implicitly found that Alinovi did have a subjective

interest in privacy prior to bringing her paper to Midland Street School since it found that she believed her paper to be private *after* she presented it to Mr. Generelli, chairman of the evaluation meeting at Midland school.

part, to an employer's work. For instance, Alinovi kept a diary spanning the period that Chris was a student in her classroom. Under the majority's relevance analysis, the principal could have demanded that Alinovi submit her journal for inspection if she had acknowledged that it contained thoughts about her experiences with Chris. Such a ruling is tantamount to telling employees that they privately criticize any aspect of their work life at their peril.

Perhaps the majority intends to restrict their no-privacy rule to material submitted to professors. Diaries and letters may still be safe but today's decision will undoubtedly have a chilling effect on free expression and critical inquiry in the classroom, especially in clinical programs and education courses that integrate work experience with classroom learning. Under the court's rule, the Midland school authorities would be free to discipline Alinovi, as they intimated they might do in this case, because her employer deemed "the content of [her academic paper] ... to reflect very poor professional judgement." If today's ruling continues unimpaired, teachers and professors would be well-advised to caution students that their work may be subject to scrutiny by persons other than those directly involved in the educational process regardless of whether the work contains highly personal, revelatory, inflammatory, or simply untactful material.

Even apart from the fact that I think the majority holding is inconsistent with federal law and accepted academic practice, I believe the ruling today impermissibly burdens first amendment freedoms. The Supreme Court has repeatedly stressed the importance of preserving an atmosphere of free expression and critical inquiry in our country's schools and universities: "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v. Tucker*, 364 U.S. 479, 487, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 (1960).

A university ... is a kind of continuing Socratic conversation on the highest level ... and the thing that you must do to the uttermost possible limits is to guarantee ... [women and] men the freedom to think and to express themselves.

*Wieman v. Updegraff*, 344 U.S. 183, 197–98, 73 S.Ct. 215, 221–22, 97 L.Ed. 216 (1952) (Frankfurter, J., concurring). *See also Keyishian v. Board of Regents*, 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *Sweezy v. New Hampshire*, 354 U.S. 234, 249–50, 77 S.Ct. 1203, 1211–12, 1 L.Ed.2d 1311 (1957).

This circuit, too, has had a long-standing tradition of being a vigorous proponent of academic freedom. We have held that "[there is] a zone of First Amendment protection for the educational process itself, which ... must include ... students and teachers [and] ... their host institutions." *Cuesnongle v. Ramos*, 713 F.2d 881, 884 (1st Cir.1983). *See also Winkes v. Brown University*, 747 F.2d 792, 797 (1st Cir.1984) ("Academic freedom, although not a specifically enumerated constitutional right, has long been viewed as a special concern of the First Amendment."); *Beitzell v. Jeffrey*, 643 F.2d 870, 875 (1st Cir.1981) (vigorous exchange of ideas is basic function of university); *Keefe v. Geanakos*, 418 F.2d 359, 362 (1st Cir.1969) (warning of dangers of chilling teacher's speech).

Because of Alinovi's dual role as student and teacher, the court's ruling has a double impact. By stripping Alinovi of her privacy rights in her paper on its submission to her professor at college, the majority holding will discourage students from engaging in critical inquiry. The implications of the majority decision for teachers' rights are no less disturbing. Most boards of education require or encourage teachers to take continuing education courses to stay abreast of developments in their field or expand their horizons on the theory that continued study will contribute to a vital and stimulating classroom performance. It is both natural and desirable that teachers focus on their teaching experiences in continuing education courses. I find it regrettable that the court lays down a rule that will stymie teachers' efforts to understand and improve their work. "Teachers [as

790

well as] ... students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. New Hampshire*, 354 U.S. at 250, 77 S.Ct. at 1211.

In addition to disagreeing with the majority's view that Alinovi had no legitimate privacy interest in an academic paper because it might be helpful to her employer, I do not believe that school authorities should be given unbridled discretion to compel production of personal papers without relation to existing need. No one has contended at trial or on appeal that Alinovi's paper contained any material information on Chris that was not already known to the evaluation team. Nonetheless, under the majority's test school authorities can compel production of material known to be merely cumulative even if the paper contains other highly personal observations.

The Supreme Court has repeatedly curtailed the power of investigating bodies to determine on their own the reasonableness of searches which encroach upon individuals' privacy interests. *See Marshall v. Barlows*, 436 U.S. at 323, 98 S.Ct. at 1825 (prohibiting warrantless regulatory searches which place unbridled discretion in hands of executive and administrative officers as to when to search for OSHA violations and whom to search); *United States v. Katz*, 389 U.S. at 357–59, 88 S.Ct. at 514–515 (denying right of police to determine reasonableness of search without judicial approval); *Sweezy v. New Hampshire*, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1963) (restricting scope of investigatory powers of state legislative committee); *Watkins v. United States*, 354 U.S. 178, 205, 77 S.Ct. 1173, 1188, 1 L.Ed.2d 1273 (1957) (restricting scope of federal legislative investigation). I do not believe that school authorities should be treated differently than other investigatory bodies and given unilateral authority to decide when papers prepared in nonemployment contexts are "relevant" and subject to seizure or examination and whether their need outweighs an individual's competing privacy interests.

## II. PRIVACY INTEREST AFTER REEVALUATION MEETING

### A. *Alinovi's Subjective Expectation of Privacy*

The majority has followed up their finding that Alinovi had no subjective interest in the privacy of her paper before she brought it to the reevaluation meeting by finding that even if she did, she abandoned that expectation of privacy when she brought the paper to Midland Street School. They reach this determination despite the district court's determination that Alinovi believed her paper to be private and in spite of the evidence.

The record shows that Alinovi, at a private meeting prior to Chris' reevaluation, sought advice from Generelli, supervisor of special education teams for the Midland Street School. At this meeting she had confided to Generelli that she felt she had been rebuffed by the principal in her efforts to talk to him about Chris and asked Generelli's advice. Generelli advised her that if she was concerned about the adequacy of Chris' educational plan, she could request a reevaluation, which she did. Alinovi testified that when she gave Generelli the paper just prior to the beginning of the reevaluation, she expected that Generelli would treat the information in the paper confidentially, as she believed he had treated the comments she had made at their private meeting.[3] The evidence shows that Generelli accepted the paper, immediately

---

3. Although Alinovi testified at trial that in giving the paper to Generelli she knew she was running the risk that he would divulge its contents to third parties, anyone who participates in a private conversation or writes a private letter runs the risk that the recipient may reveal the contents or thoughts to third persons. *See also*

P. Goldberger, *Consent, Expectations of Privacy, and the Meaning of "Searches" in the Fourth Amendment*, 75 Journal of Criminal Law and Criminology, 319, 332 (1984) (concept of "assumption of risk" limited to cases of third-party consent).

put it into his briefcase, and did not refer to it or read from it at any time during the evaluation. When Alinovi asked for it back at the end of the meeting, Generelli promptly and without reservation handed it to her. The next day when Principal Bombard requested the paper Alinovi told him that she had fulfilled her duty to inform the evaluation team of all information she had concerning Chris but that her paper, written for other purposes in another context, was private. The district court found that "the plaintiff fe[lt] ... that the report was her private paper...." I would uphold the district court and find that Alinovi had a subjective expectation of privacy in her paper even after she gave the paper to Generelli.

### B. *Exposure to Public View*

The majority found that Alinovi had no legitimate privacy interest once she brought the paper to Midland Strèet School because in giving it to the chairman of the special education evaluation team she exposed her paper to public view. In so ruling, I believe that the majority has misapplied *Illinois v. Andreas,* 463 U.S. 765, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983), the case on which it relies. In *Andreas,* a customs officer at an airport opened a container holding marijuana. He notified Drug Enforcement Agents who saw the marijuana inside the container and then resealed the container and delivered it to the addressee's residence where Andreas took possession of it. When Andreas was arrested, he tried to assert a privacy interest in the marijuana. The Supreme Court ruled that no protected privacy interest remains in contraband inside a container once government officers have lawfully opened the container and examined its contents. *Andreas,* 463 U.S. at 771, 103 S.Ct. at 3323.

Alinovi was obviously not asserting a privacy interest in the physical sheets of paper that were viewed, but in the

thoughts expressed thereon, thoughts which clearly were not "exposed" in any meaningful way.[4] Therefore, I cannot agree that when Alinovi brought the paper to the reevaluation meeting and gave it to Generelli, who immediately placed it inside his briefcase and returned it to her unread, that she had "exposed the paper to view" and thereby lost her expectation of privacy.

### C. *Private Paper v. Work Product*

Because the majority grounds its decision that Alinovi's privacy claim fails on the reasons that I have previously discussed, they did not address what I believe to be the real issue in this case: Whether Alinovi submitted her private academic paper into the educational evaluation process when she gave it to Generelli at the meeting and thereby transformed it into a professional work product.

Clearly the school has a substantial interest in gathering the full panoply of information available on a student in order to implement the child's Individualized Educational Plan (IEP) pursuant to its responsibilities under Chapter 766, Mass.Gen. Laws Ann. ch. 71B (West 1982). The regulations for the implementation of Chapter 766 require that the "Administrator" of an evaluation team direct that "assessments" be prepared by a "TEAM" of specialists. The TEAM specialists typically include the child's teacher, adjustment counselor, physician, psychologist, etc. Each person preparing an assessment must summarize in writing the procedures employed in conducting their assessment, results, and their diagnostic impression as well as define in detail their view of the child's needs. Mass.Admin.Code tit. 603 §§ 319.0–319.4. Section 310.3 of the regulations requires that current records be kept of all information relating to evaluations. Records must be available for inspection by the child's

---

**4.** The majority also cites *Katz* for the proposition that "what a person knowingly exposes to the public, even in his home or office, is not a subject of Fourth Amendment protection." The Supreme Court, however, did not stop there, but went on to state, "But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Katz,* 389 U.S. 347, 351–52, 88 S.Ct. 507, 511–12, 19 L.Ed.2d 576 (1967).

parents and can be useful in review of the child's progress after an IEP is adopted.

Given the clear import of the regulations, I have no doubt that once a paper is submitted by a TEAM participant and accepted into the evaluation process to help in the child's evaluation, whether read or not, it becomes part of the child's educational record. I would find this to be so regardless of whether the paper was previously a research paper, a journal entry or, as is normally the case, was prepared specifically for the evaluation.

If, under the facts of the case, Alinovi's giving of her paper to Generelli transformed it from a private paper into a professional work product, then the administrators of the special needs program would be deemed to be on notice of its contents whether or not they read it, and Alinovi would have lost her right of privacy in it. If the paper was not accepted into the evaluation process and was not, under Chapter 766, a submission that became part of the student's record, then I believe we should follow the well-established law that when a search is based upon consent and consent is withdrawn or revoked the searchers must abide by the limitations placed upon them by the consenting individual. *See, e.g., Linn v. Civatero,* 714 F.2d 1278, 1288 (5th Cir.1983); *United States v. Ward,* 776 F.2d 143 (9th Cir.1978); *Mason v. Pulliam,* 557 F.2d 426 (5th Cir.1977). *See also* LaFave, *Search and Seizure* § 8.1(c) (1978); *Model Code of Pre-Arraignment Procedure* §§ SS 240.3 (Official Draft 1975).

Since the district court did not address what I conceive of as is the central issue, I would remand for factual findings on it.